UNITED STATES of America,
Plaintiff-Appellee,

v.

Abel Leopoldo BAUTISTA and Rene
Jose Monsivais, Defendants-
Appellants.

Nos. 74–1421 and 74–1544.

United States Court of Appeals,
Ninth Circuit.

Jan. 6, 1975.

Victor Sherman, Nasatir, Sherman & Hirsch, Beverly Hills, Cal., for defendants-appellants.

William D. Keller, U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before DUNIWAY and CHOY, Circuit Judges, and SMITH,* District Judge.

## OPINION

RUSSELL E. SMITH, Chief Judge:

A jury, viewing the evidence in the light most favorable to the Government, might reasonably have found from the evidence that:

On August 6, 1973, Agent Chretien of the Drug Enforcement Administration, in the company of an informant named Taylor, waited in a car near a public park in Oxnard, California. A truck, with Defendant Bautista driving and Defendant Monsivais in the passenger seat, drove by. It did not stop, circled the block, and drove by again in about five minutes. At that time Defendant Bautista motioned to Chretien and Taylor and shouted "follow me." Bautista, with Chretien following, drove to an open field and parked. Taylor, who had previously been searched with negative results, left the Chretien car and went to the truck, talked briefly with Monsivais, and returned to the Chretien car. Taylor procured $650.00 in marked bills from Chretien, which he then delivered to Monsivais, and engaged in some conversation with Bautista. When Taylor returned to the Chretien car Chretien then drove to a "Stop" sign some distance from the meeting place, and at the base of the sign discovered the heroin which is the subject of Counts 2 and 3 of the indictment.

On August 16, 1973, Chretien and Taylor met Monsivais at another public park. Again marked money was paid by Taylor to Monsivais and again the heroin, which is the subject of Counts 4 and 5 of the indictment, was found at the base of the same "Stop" sign.

On August 21, 1973, Chretien, while driving by, observed Monsivais and Bautista talking in front of a house in Oxnard, California. He returned a short time later and discussed with Monsivais the price and quality of heroin. On this occasion Monsivais said that the heroin was Chato's and was good heroin and gave Chretien a telephone number. Bautista approached and talked to Monsivais in Spanish. When he departed Monsivais said, "He's okay; he's the number one man."

On August 23, 1973, Chretien met Bautista and Monsivais in the Showboat Bar and talked to them. All were in a radius of about 10 feet. Chretien put $700.00 in marked bills on a pool table, and Monsivais picked it up and went to a men's restroom to count it. While Monsivais was gone Bautista and Chretien played pool. Monsivais came back, and while all three were standing around the pool table, Monsivais told Chretien that the stuff was in the gas station on the corner under the sink in the men's room. Chretien left the bar, found more than one gas station on the near corners, and returned to the bar for further advice. Bautista pointed and said, "It is the one closest to us on the corner in the men's

---

* The Honorable Russell E. Smith, Chief Judge of the United States District Court for the District of Montana, sitting by designation.

room." Chretien found the heroin which is the subject of Count 6 and 7 of the indictment.

On August 27, 1973, Chretien called the number Monsivais had given him and talked to Monsivais about future transactions. Monsivais, among other things, said, "The chubby guy who was with me would like to meet you." Chretien understood the reference to the chubby guy to mean Bautista. On August 28, 1973, Chretien and another agent met with Monsivais at the Showboat Bar. Chretien asked where "Poli" (meaning Bautista) was, and Monsivais answered that he couldn't make it because he was cutting narcotics. During the conversation Monsivais likewise referred to his partner and to a discussion he and the partner had had relating to the heroin traffic. At this time a deal was made for the delivery of 5 ounces of heroin. Again the name "Chato" was mentioned in connection with the heroin.

On August 29, 1973, at about 12:30 P.M. Chretien met Monsivais at the Windjammer Bar and displayed the money to be used to buy the heroin. Monsivais told Chretien where the heroin was and Monsivais and Chretien left the bar and went to a phone booth. Chretien called undercover agent Jackson and gave him the location of the heroin. Monsivais and Chretien then went to the Showboat Bar where they met Bautista. A short time later Monsivais and Bautista were arrested at the Showboat Bar. The heroin found by Agent Jackson at the described location was the subject of Counts 10 and 11 of the indictment.

Bautista was convicted on Counts 1, 2, 3, 6, and 7. Monsivais was convicted on Counts 1, 2, 3, 4, 5, 6, 7, 10, and 11. Counts 8 and 9 were dismissed. The sentences imposed on all counts ran concurrently.

Bautista claims that the evidence was insufficient to convict him because there were within the Government's case internal conflicts rendering the evidence inherently incredible. We have examined the evidence and do not agree.

Both defendants claimed that there was error in the court's refusal to compel the informant, Taylor, to testify.[1]

■ The Government is not required to grant immunity to a prospective witness for a defendant. United States v. Jenkins, 470 F.2d 1061 (9th Cir. 1972), cert. denied, 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973); Cerda v. United States, 488 F.2d 720 (9th Cir. 1973). Defendants urge that this case falls within a possible exception noted in Earl v. United States, 124 U.S.App.D.C. 77, 361 F.2d 531 (1966), where the court indicated in a footnote that had the Government secured testimony by granting immunity to one eyewitness it might as a matter of due process be required to grant it to another to make evidence available to the defendant. Here, however, the Government granted immunity to no one.

■ The point is made that the court erred in not ruling that Taylor was not entitled to rely on a fifth amendment privilege. That problem, which is different from the problem of a Government grant of immunity, was never presented to the trial court during the trial.[2] Early in the trial the fact that Taylor had refused to testify for the Government was disclosed by the United States Attorney. The court initially told Taylor that he would be required to testify unless he had some constitutional protection, such as the fifth amendment. After the Government's case was in, a written motion was filed by defendants asking the court to compel the Government to grant immunity to Roman. This motion may have been orally enlarged to embrace Taylor. In any event, the court denied it. At no time did the defendants call Taylor, who was physi-

---

**1.** Bautista makes the same contention as to one Roman through whom the Government had intended to prove overt act 11 of Count 1 and Counts 9 and 10. The court dismissed Counts 9 and 10 and offered on request of defendant to tell the jury to disregard overt act 11 of Count 1. Under these circumstances there could be no error as to Roman.

**2.** The problem was raised, as will be noted, at the hearing on the motion for new trial.

cally available to them, as a witness, and at no time was the court given an opportunity to pass upon Taylor's fifth amendment rights. Taylor, who was in this case in the role of a witness as distinguished from a defendant,[3] could not refuse to take the stand and be examined. His privilege would have arisen only when the answer to some question asked would have tended to incriminate him, and it would have been for the court to say whether silence was justified. Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). Had Taylor been called, the court would then have faced the problem of whether and to what extent Taylor's status as a paid informant altered his fifth amendment rights. The court would have been required to pass upon each question asked and determine from the facts disclosed by the evidence and from his personal perception of the peculiarities of the case whether an injurious disclosure could result from an answer. Hoffman v. United States, *supra.* The court committed no error in refusing to require the Government to grant Taylor immunity, and it cannot be put in error for not ruling during the trial on the scope of Taylor's fifth amendment rights, a problem never presented to it. Fed.R.Crim.P. 51.

■ A variation of the same problem arises in connection with the motion for a new trial. Taylor was called by the defendants as a witness and asked whether he was known by the name "Chato." He claimed fifth amendment privilege and the court sustained his claim. Evidence had been given at the trial from which it could be inferred that a "Chato" was heavily engaging in the narcotics traffic. It also appears from the record that Taylor had narcotics charges pending, not related to the charges against defendants here. Only an affirmative answer to the question would have been of value to defendants, and on the record we cannot say that an affirmative answer would not have been an injurious disclosure to Taylor, and

that it could not have tended to incriminate him as to matters falling outside of any of the transactions alleged in the indictment in these cases. The trial court did not err in sustaining the claim of privilege.

■ Defendants requested the court to give the so-called "missing witness" instruction. Vol. 1, E. Devitt and C. Blackmar, Federal Jury Practice and Instructions § 12.15 (2d ed. 1970). Whether this instruction should be given is a matter that lies within the discretion of the trial court. Under the circumstances here there was no abuse of discretion in the court's refusal to give the instruction. Morrison v. United States, 124 U.S.App.D.C. 330, 365 F.2d 521 (1966). Yaw v. United States, 228 F.2d 382 (9th Cir. 1955), is not contrary. That case dealt with a failure of proof which might have been cured by an available witness not called. The court did not consider the missing witness instruction.

■ Defendant Monsivais makes a further point with respect to the missing witness instruction: the trial court indicated prior to argument that it would give the instruction. When counsel for Monsivais was about 240 words into his argument and before he had said anything even remotely involving the missing witness instruction, the court called counsel to the side bar and told him that the missing witness instruction would not be given as to Taylor and Roman. Later counsel for Monsivais brought the lack of Taylor's testimony into his argument and was stopped. The court did misinform counsel as to instruction prior to their arguments, and that was a technical error under Fed.R.Crim.P. 30. The error was corrected, however, immediately after the argument started and before defendant's counsel had committed himself to any theory based on the missing witness instruction. The case was relatively simple. Under all of the circumstances we do not find that the error committed was prejudicial. The case is unlike Wright v. United States, 339 F.2d

---

**3.** *See* United States v. Housing Foundation of America, 176 F.2d 665 (3d Cir. 1949).

578 (9th Cir. 1964), relied upon by defendant, where defendant's counsel was not advised of the nature of the instructions to be given and made an argument on a theory which the court either rejected or ignored in its instructions subsequently given.

■ Objection was made to the introduction of Exhibits 1–C and 2–C, balloons containing heroin. These exhibits had been given by Agent Chretien to Agent McGlone for fingerprint examination and were returned by McGlone to Chretien and by him forwarded to the chemist for analysis. There was no evidence that the exhibits were not altered while in McGlone's possession. Within the rule stated in Gallego v. United States, 276 F.2d 914 (9th Cir. 1960), the admission of these exhibits did not constitute error. *See* Williams v. United States, 381 F.2d 20 (9th Cir. 1967); Harris v. United States, 371 F.2d 365 (9th Cir. 1967).

■ At the hearing on a motion for new trial on the ground of newly-discovered evidence, testimony was given to the effect that Taylor's (the informant's) nickname was "Chato." The Government introduced substantial evidence to the contrary.[4] The trial court resolved the conflicts in the evidence and specifically found that Taylor was not known as "Chato." The claimed error is in the denial of a motion for new trial. It is not the province of the circuit court to review the trial court's findings of fact unless they are wholly unsupported by the evidence. United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946). The trial court also found that the evidence, if admitted, would not tend to produce an acquittal. That appraisal was a matter within the discretion of the trial court. Wolcher v. United States, 233 F.2d 748 (9th Cir. 1956). We find no error in the denial of the motion for new trial.

We have examined the other claimed errors and find no merit in them.

The judgments of conviction are affirmed.

4. The problem here is a different problem than the one arising in assessing a witness's claim of privilege. Here the court sought to determine the truth of an assertion from the available evidence. In passing upon the claim of privilege the court did not seek to determine the truth of an answer to the question asked. The court appraised the question and if any answer to it would have tended to incriminate, then the privilege was properly claimed. Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997 (1955).