UNITED STATES

v.

David L. MARTIN, 252 02 7426, Corporal
(E–4), U. S. Marine Corps.

NCM 78 1151.

U. S. Navy Court of Military Review.

Sentence Adjudged 19 May 1978.

Decided 7 Aug. 1979.

On Reconsideration 16 June 1980.

CAPT G. M. Potter, USMC, Appellate Defense Counsel. LCDR P. B. Haskel, JAGC, USN, Appellate Defense Counsel. LT David S. Durbin, JAGC, USNR, Appellate Defense Counsel.

LT J. G. Van Winkle, JAGC, USNR, Appellate Government Counsel.

Before CEDARBURG, C. J., and FERRELL and ROOT, JJ.

FERRELL, Judge:

The appellant was tried before a general court-martial, with members, at Camp Pendleton, California, during April and May, 1978. Contrary to his not guilty plea, ap-

pellant was convicted of the following Charge and specification:

Charge: Violation of the Uniform Code of Military Justice, Article 118, 10 U.S.C. § 918.

Specification: In that Corporal David L. Martin, U. S. Marine Corps, Headquarters and Service Company, 1st Reconnaisance Battalion, 1st Marine Division (Rein), Fleet Marine Force, Camp Pendleton, California, did, at the Wire Mountain One Housing Area, located at Marine Corps Base, Camp Pendleton, California, on or about 7 February 1978, murder Mrs. Leslie Martin, his wife, by means of strangulation.

The court sentenced appellant to be reduced to pay grade E–1, to forfeit all pay and allowances, to be confined at hard labor for 30 years, and to be discharged from the Marine Corps with a dishonorable discharge. The general court-martial convening authority, on 19 July 1978, approved the sentence as adjudged.

Mrs. Leslie Martin was found on her bed in the family's quarters at Camp Pendleton, California, about 0745, 7 February 1978. The discovery was made by Mrs. Nicholson, a family friend of the Martins. Mrs. Nicholson, after seeing the coloration of Mrs. Martin's face, felt for a pulse but could find none. She went next door, called the emergency number and explained what she had found. Mrs. Martin was dressed in her panties, brassiere, and religious garments.[1] She was on her back, situated lengthwise on the bed, uncovered, with her hands clasped in front of her. Mrs. Martin's head was tilted to the right with her left cheek up. The left cheek had a bite-mark on it. Rescue personnel arrived within minutes after being notified and undertook emergency procedures. Mrs. Martin was moved by ambulance to the Naval Regional Medical Center at Camp Pendleton and received emergency medical treatment. Despite the best efforts of rescue and medical personnel, Mrs. Martin was pronounced dead at 0852. Rescue and medical personnel were unable to detect a pulse or other vital signs indicating life, but the body was warm when received in the hospital emergency room.

Appellant, in his brief, assigns seven errors. The assigned errors are not discussed in the same order as presented by appellate counsel.

I

THE GENERAL COURT–MARTIAL CONVENING AUTHORITY ABUSED HIS DISCRETION WHEN HE REFUSED TO GIVE HODGE A TESTIMONIAL GRANT OF IMMUNITY.

■ Corporal Hodge resided in an apartment in the same building as the Martins on the day of Leslie Martin's death. Corporal Hodge was called to the stand, in an Article 39(a), Uniform Code of Military Justice, 10 U.S.C. § 839(a), session, by the defense and asked certain questions about his relationship with the Martins and his activities on the morning of Mrs. Martin's death. He exercised his rights under Article 31(b), Uniform Code of Military Justice, 10 U.S.C. § 831(b), and refused to answer most of the questions of defense counsel. The military judge ruled that Corporal Hodge properly exercised his Article 31(b) rights. The trial counsel was then directed by the military judge to present the matter to the convening authority and ascertain if he would grant testimonial immunity to Corporal Hodge. The trial counsel reported to the military judge that he had seen the convening authority and explained to him the legal ramification of the grant of testimonial immunity in the case. The convening authority declined to grant testimonial immunity to Corporal Hodge.

Appellant, in his brief, argues that the question this Court has to answer is whether the convening authority abused his discretion when he refused to give Corporal Hodge a testimonial grant of immunity. Appellate counsel, however, cites no authority in his brief which would support the conclusion that appellant has standing to

---

1. Mrs. Martin belonged to the Morman Church and had on the prescribed religious garment. The garment is of light material and is worn beneath the dress.

base a complaint on whether or not immunity is granted to another individual. The weight of authority is that the Government is not required to grant immunity to a witness for a defendant. *United States v. Bautista,* 509 F.2d 675 (1975), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *United States v. Jenkins,* 470 F.2d 1061 (8th Cir. 1972), *cert. denied,* 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973); *United States v. Beasley,* 550 F.2d 261 (5th Cir. 1977), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); *United States v. Smith,* 542 F.2d 711 (7th Cir. 1976). We find no support for the contention that the convening authority, when he declined to grant testimonial immunity, was unreasonable, arbitrary, exceeded the bounds of reason, or showed an unconscionable attitude. There is no merit in this assigned error.

## II

REVERSIBLE ERROR WAS COMMITTED WHEN THE JURY WAS INFORMED BY A GOVERNMENT WITNESS THAT THE APPELLANT HAD TERMINATED HIS INTERVIEW WITH THE NAVAL INVESTIGATIVE SERVICE BY EXERCISING HIS RIGHTS AND ASKING TO SEE A LAWYER.

 The law is well established that evidence of the accused's reliance on his right to remain silent or his right to consult with an attorney is inadmissible against him. Paragraph 140(a)(4), *Manual for Courts-Martial, 1969 (Rev.); United States v. Stegar,* 16 U.S.C.M.A. 569, 37 C.M.R. 189 (1969); *United States v. Nees,* 18 U.S.C.M.A. 29, 39 C.M.R. 129 (1968); *United States v. Martin,* 16 U.S.C.M.A. 531, 37 C.M.R. 151 (1967); *United States v. Jones,* 16 U.S.C.M.A. 22, 36 C.M.R. 178 (1966); *United States v. Workman,* 15 U.S.C.M.A. 228, 35 C.M.R. 200 (1965); *United States v. Kemp,* 13 U.S.C.M.A. 89, 32 C.M.R. 89 (1962); *United States v. Brooks,* 12 U.S.C.M.A. 423, 31 C.M.R. 9 (1961); *United States v. Bayes,* 11 U.S.C.M.A. 767, 29 C.M.R. 583 (1960); *United States v. Bolden,* 11 U.S.C.

M.A. 182, 28 C.M.R. 406 (1960); *United States v. Kowert,* 7 U.S.C.M.A. 678, 23 C.M.R. 142 (1957); *United States v. McBride,* 50 C.M.R. 126 (A.F.C.M.R.1975); *United States v. Eskridge,* 41 C.M.R. 912 (A.F.C.M.R.1969). Accepting, as we do in the case *sub judice,* that the exercise by the appellant of his right to consult with counsel was not admissible, the issue is whether its admission was prejudicial. The standard of specific prejudice is to be our guide in evaluating the effect of the testimony. *United States v. Workman, supra.* In applying the standard of specific prejudice, certain evidence is particularly pertinent, as well as the manner in which the evidence came before the members.

The prosecution called Mr. Stamper, a special agent for the Naval Investigative Service, to testify as part of its case. Mr. Stamper's testimony during direct examination by the Government covered the interrogation of the appellant on 7 February 1978. Mr. Stamper, during direct examination, related he advised appellant of his rights, which appellant waived, and then appellant furnished certain information concerning his activities on the day before and morning of Mrs. Martin's death.

During cross-examination, the following transpired, giving rise to this issue:

Q. You stated that you had an interview with Corporal Martin on the morning of the 7th of February. Approximately how long did that interview last?

A. Approximately 30 minutes. I'm not sure of the exact time. It was terminated by legal counsel.

Q. What time did you begin talking to him, sir?

A. Approximately 1014 is when I first talked to him. We waived his rights at approximately 1020. And I believe some time around 11:00 is when the interview was terminated. . . .

(R.383).

．　　．　　．　　．　　．

Q. Isn't it true that one of his first statements was "I don't know what this is all about, but I want a lawyer."?

A. I did not hear that. Special Agent Valentine related to me that that statement was made.

Q. And then after—after he was told what he was there for, and then he said, "Then I don't want a lawyer, and I want to talk." Is that correct?

A. After the advisement of rights he indicated—told what he was suspected of, he did waive his rights.

(R.384). The trial counsel and defense counsel also conducted redirect and re-cross examination of the witness, but no reference was made to appellant's request for counsel. The military judge, in response to a member's inquiry, directed some questions to Mr. Stamper. These questions pertained to the appellant's response when advised his wife was dead and he was suspected of murder. The members, by their questions revealed no interest in further inquiry into appellant's terminating the interview by requesting counsel.

The witness, Mr. Stamper, was excused and left the courtroom. The military judge then gave the following instruction to the members:

MJ: Mr. President, during the course of Mr. Stamper's testimony, he indicated that the—at least I understood his testimony to be—that the interview was terminated because the accused asked for counsel. You may not draw any inference from that which is adverse to the accused. As I'm sure all of you well—are well aware, if a person becomes a suspect in an offense, one of the rights which he's accorded is the right to ask for counsel and he has an absolute right to terminate any interview which he has voluntarily commenced for any reason or no reason and for the purpose of asking for counsel.

So, my instruction to you is that you may not infer adversely to the accused that if he terminated the interview because he wanted to seek counsel, that therefore he must have something to hide or therefore he must be guilty. Any question about that?

Any objection to that instruction by either side?

TC: Not by the government, Your Honor.

IMC: Not by the defense, Your honor. (R.389, 390).

The military judge, after the above instruction to the members, excused them and conducted an Article 39(a) session. During this session, the military judge expressed his displeasure at being surprised that there was a pretrial statement by the appellant. During this discussion, the defense counsel made the following comments:

DC: Yes, sir. There was a—there was a knowing waiver. Obviously the reason I wanted the testimony as it was, was that yes, he wanted a lawyer until he was told what happened, and obviously at that time he decided he didn't need a lawyer and he wanted to talk about it, sir. I had no problems with what happened, sir, from a defense standpoint.

(R.390).

The statement concerning the termination of the interview of the appellant by counsel was not elicited by the prosecution, but occurred during cross-examination. We are not unmindful the witness was an agent of the Naval Investigative Service and as such was probably an experienced witness. His testimony, however, when read in its entirety, appears to be responsive to the questions propounded and professional in every respect. It bears no resemblance to a vindictive witness looking for vague opportunities to slip in information he knows is inadmissible under the rules of evidence.

The trial defense counsel offered no objection, or motion, and requested no instruction by the military judge. The military judge did instruct the members *sua sponte* that they were not to make any adverse inferences against the accused for exercising his rights. Our review of the record convinces us that the defense counsel, as a matter of trial tactics, chose to reveal to the members appellant's conduct when interrogated on 7 February 1978. He brought out during cross-examination of Mr. Stamper that appellant initially requested counsel and then waived counsel and made a statement. This was also disclosed by appellant

during his direct examination. We find no specific prejudice, under the circumstances, resulting from that portion of Mr. Stamper's answer which disclosed the interview was terminated by counsel. The non-prejudicial effect of this answer is further bolstered by the court members who proposed questions, prior to the military judge's instruction, none of which pertained to appellant's terminating the interview by requesting counsel. We find no merit in this assignment of error.

### III

THE MILITARY JUDGE ERRED TO THE PREJUDICE OF THE APPELLANT WHEN HE ALLOWED INADMISSIBLE HEARSAY TESTIMONY TO COME BEFORE THE JURY AND THEN REFUSED TO GIVE A REQUESTED LIMITING INSTRUCTION.

■ Staff Sergeant Turner, a special agent with the Naval Investigative Service, testified that Sergeant Gonzales, at 1700 on 7 February 1978, could identify an automobile in the Provost Marshal's lot. The defense counsel objected to this testimony as hearsay. The military judge agreed the answer was hearsay, but found it admissible for a legitimate purpose. Sergeant Gonzales, during prior cross-examination by the defense counsel, had stated that he did not think the automobile that he was shown by the agent was the same automobile he had seen parked in the street outside his quarters at 0555 on 7 February 1978. The military judge instructed the members concerning Staff Sergeant Turner's testimony:

The response of the witness is to be considered only in this regard considering what Gonzales told him, only as a predicate for what activities this particular witness did and not for the truth of the content which is contained in the statement.

(R.427). We find no error in the way the military judge ruled and instructed in regard to this testimony. Sergeant Gonzales' testimony had been attacked by the use of prior inconsistent statements and the

Government could, under these circumstances, bolster his credibility by prior consistent statements. *United States v. Kellum,* 1 U.S.C.M.A. 482, 4 C.M.R. 74 (1952).

If we accepted appellant's argument that this testimony was inadmissible, we find no prejudice. Appellant testified he was in the apartment on the morning of 7 February 1978, that he parked his car in the vicinity where Sergeant Gonzales saw it, and that he drove away shortly before 0600. We find no merit in this assigned error.

### IV

THE MILITARY JUDGE ERRED TO THE PREJUDICE OF THE APPELLANT WHEN HE REFUSED TO EITHER ALLOW THE RESULTS OF THE POLYGRAPHS WHICH WERE ADMINISTERED TO THE APPELLANT TO COME BEFORE THE MEMBERS OR ALLOW THE APPELLANT'S DEFENSE COUNSEL TO ESTABLISH A FOUNDATION FOR THE ADMISSIBILITY OF THE APPELLANT'S POLYGRAPH EXAMINATIONS WHICH WERE ADMINISTERED IN THIS CASE.

Appellant, prior to trial, was administered several polygraph tests by different examiners. The initial tests were by operators selected by the appellant, followed by tests administered by a qualified Naval Investigative Service operator. During these examinations, appellant was asked questions such as: "Did you talk with Leslie that morning?" "Did you cause Leslie's death?" "Did you bite Leslie that day?" "Do you know for sure who killed Leslie?" The polygraph operators agreed that appellant showed no deception in his exculpatory responses to the several questions.

The military judge refused to admit the results of these tests during the court-martial and further denied the appellant the opportunity to establish a foundation for the admissibility of the results of the polygraph examination. Appellant argues these rulings by the military judge constituted error.

■ The introduction of polygraph evidence during a trial by court-martial is prohibited by the *Manual for Courts-Martial* and case law. Paragraph 142e, *Manual for Courts-Martial, 1969 (Rev.)*; *United States v. Ledlow*, 11 U.S.C.M.A. 659, 29 C.M.R. 475 (1960); *United States v. Dolan*, 17 U.S.C.M.A. 476, 38 C.M.R. 274 (1968); *United States v. Bras*, 3 M.J. 637 (N.C.M.R.1977). The military judge was correct when he denied the admission of the results of the polygraph examination. The correctness of his ruling being based on long and well-established legal precedent, he was also correct in denying appellant the opportunity to attempt to establish a foundation for its admissibility.

## V

THE MILITARY JUDGE ERRED TO THE PREJUDICE OF THE APPELLANT WHEN HE ALLOWED THE GOVERNMENT TO CALL DOCTOR SPERBER AS AN EXPERT WITNESS IN THE FIELD OF BITE-MARK IDENTIFICATION.

■ There are no published opinions concerning the admissibility of bite-mark identification in courts-martial tried under the Uniform Code of Military Justice.

Appellant contends this Court should decide:

1. Bite-mark identification has not reached a sufficient level of scientific reliability as to be admissible as evidence before a court-martial.

2. The military judge erred to the prejudice of the appellant by allowing Dr. Sperber to present bite-mark identification evidence.

3. As a result of the military judge's error, the findings and the sentence in the case *sub judice* must be set aside.

We have carefully considered these questions, aided by the very able presentations of counsel for both sides at the trial and appellate levels, and have decided as follows:

1. Bite-mark identification has reached a sufficient level of scientific reliability as to be admissible as evidence before a court-martial.

2. The military judge did not err by allowing Dr. Sperber to present bite-mark identification evidence.

The landmark case pertaining to the admissibility of scientific evidence in the United States is *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). The test established in *Frye* has been recognized by the United States Court of Military Appeals in cases tried by courts-martial. The Court, in *United States v. Hulen*, 3 M.J. 275 (C.M.A. 1977), stated:

> In *United States v. Ford*, 4 U.S.C.M.A. 611, 613, 16 C.M.R. 185, 187 (1954), we adopted the test set forth in *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013, 1014 (1923), for the admissibility of expert testimony. That test is defined in the following manner:
>
> " . . . Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

■ Bite-mark identification has been admitted in evidence (or its approval indicated) by the courts of several states,[2] while no cases are reported in which a jurisdiction has excluded its admission. We find the three-pronged analysis set out in *People v. Slone*, 76 Cal.App.3d 611, 623, 143 Cal.Rptr. 61, 68 (Dist.Ct.App.1978) to be a valid test to determine whether such evidence should be admitted. The guideposts established in *Slone* are: first, the scientific acceptance and reliability of the methods used must be established; second, the expert testifying

2. California, Illinois, Louisiana, New York, Oregon, Texas and Vermont.

must establish his credentials which qualify him to render an opinion, and, third, the proponent of the evidence must demonstrate that correct scientific procedures were used. We are satisfied all three requirements were met in the case *sub judice.*

The scientific acceptance and reliability of the methods used have been recognized by the appellate courts of various states. In *People v. Watson,* 75 Cal.App.3d 384, 402, 142 Cal.Rptr. 134, 143–144 (Dist.Ct.App. 1977), the court said:

> The principles governing admission of "bite-mark" evidence have been authoritatively stated in *People v. Marx,* 54 Cal. App.3d 100, 126 Cal.Rptr. 350. As *Marx* indicates, while bite-marks identification has not reached a level of scientific development comparable to well-recognized techniques of identification through dentition, such evidence is nevertheless admissible when based upon "scientifically and professionally established techniques —X-rays, models, . . . photography—to the solution of the particular problem, which, though novel, was well within the capability of those techniques."

The admissibility of bite-mark evidence was accepted in the Texas courts in *Doyle v. State,* 159 Tex.Cr.R. 310, 263 S.W.2d 779 (1954), and *Patterson v. State,* 509 S.W.3d 857, 863 (Tex.Cr.App.1974).

The appellate court of Illinois, Second District, First Division, in *People v. Milone,* 43 Ill.App.3d 385, 2 Ill.Dec. 63, 356 N.E.2d 1350 (App.Ct.1976), dealt with the question of bite-mark identification. The court cited another Illinois case, *People v. Johnson,* 8 Ill.App.3d 457, 289 N.E.2d 722, 726 (App.Ct. 1972), and cases from other states which had admitted bite-mark identification, as well as numerous articles from scientific journals treating the question. After a thoughtful and thorough discussion of the authorities, the court in *Milone* stated:

> Similarly, in the instant case, the trial judge was correct in allowing expert testimony to aid his comparison between the bite mark on Sally Kandel's thigh and the dentition of the defendant. The weight

given this testimony was within the province of the court, and nothing in the record indicates that the trial judge abused his discretion in allowing the testimony. . . .

The record unquestionably established that Dr. Sperber is an expert in the field of bite-mark identification. He was so recognized at trial by Dr. Beckstead, a witness for the appellant, another expert in this very limited field of about 30 individuals nationwide. There were, as might be expected, differences of opinion in this case between the expert for the Government and the expert for the defense, but these differences go to the weight rather than to the admissibility, *Patterson v. State, supra.* We find no merit to this assignment of error.

## VI

THE MILITARY JUDGE ERRED TO THE PREJUDICE OF THE APPELLANT WHEN HE ALLOWED THE APPELLANT'S DENTAL DETENTIONS AND THE EVIDENCE DERIVED THEREFROM TO BE ADMITTED INTO EVIDENCE BECAUSE THIS EVIDENCE WAS BOTH THE POISONOUS FRUIT OF AN ILLEGAL SEARCH AND THE PRODUCT OF A VIOLATION OF THE APPELLANT'S ARTICLE 31 RIGHTS.

■■■ Appellant was arrested on suspicion of the offense in question on the morning of 7 February 1978. He was advised of his Article 31 rights at that time, and was soon provided counsel. He has never contended the arrest was improper. On 10 February, appellant was advised the Government intended to take impressions of his teeth. On 11 February, the Government took those impressions, with the cooperation of, but over the objection of, appellant. Appellant contends the taking of his teeth impressions violated his Article 31 rights and his rights under the Fourth and Fifth Amendments of the Constitution of the United States.

In *United States v. Culver,* 44 C.M.R. 564, 566 (A.F.C.M.R.1971), the accused was ex-

amined to determine if a tooth fragment matched a broken tooth in his mouth. The results of the examination were objected to at trial as a violation of the Sixth Amendment since counsel was not present at the examination nor was the accused advised as to his right to counsel or the right to remain silent. The court in *Culver* stated:

> We are not here confronted with any question involving the *Miranda* rule or a lack of advice to Culver of his right to remain silent. The former is inapplicable to the facts here for there was no "interrogation," as such, involved, and the latter doesn't apply because the passive submission of accused's body to a physical examination simply does not constitute a "statement" within the meaning of Article 31(b), Code, supra, or the Fifth Amendment to the Constitution. Cf. *United States v. Bennett*, 7 U.S.C.M.A. 97, 21 C.M.R. 223 (1956); see also *McFarland v. United States*, 150 F.2d 593 (D.C. Cir.1945), cert. denied, 326 U.S. 788 [66 S.Ct. 472, 90 L.Ed. 478] (1946), rehearing denied, 327 U.S. 814 [66 S.Ct. 526, 90 L.Ed. 1038] (1946); and 164 A.L.R. 967. Nor would such examination constitute the compulsion contemplated by Article 31(a), Code, supra. See *United States v. Williamson*, 4 U.S.C.M.A. 320, 15 C.M.R. 320 (1954); *United States v. Rosato*, 3 U.S.C.M.A. 143, 11 C.M.R. 143 (1953).

In *United States v. Holland*, 378 F.Supp. 144 (E.D.Pa.1974), the United States District Court for the Eastern District of Pennsylvania permitted a dental examination of the defendant to determine whether or not he was missing a tooth in the area of his mouth corresponding to that pinpointed by a witness to the F.B.I. The defendant claimed the examination violated his Fourth and Fifth Amendment rights. The court found that claim "plainly without merit." In addressing the Fifth Amendment issue, the court stated the examination was neither testimonial nor communicative in nature, and that, considering the Fourth Amendment issue, a dental examination of the defendant's mouth did not constitute a search.

The state courts which have dealt with these issues have followed the same line of reasoning. In *Patterson v. State*, 509 S.W.2d 857, 862 (Tex.Cr.App.1974), a police officer took the defendant to a dentist to obtain a cast of his teeth. The appellant contended the trial court erred in admitting evidence of a mold or cast of his teeth taken in violation of the search and seizure provision of the Fourth and Fourteenth Amendments to the Federal Constitution. The Texas court held ". . . that to require the appellant to produce a mold of his teeth is not in violation of any constitutional protection." In another Texas case, *Doyle v. State*, 159 Tex.Cr.R. 310, 263 S.W.2d 779 (1954), the defendant was asked by the Sheriff to bite a piece of cheese. This piece of cheese was compared to one found at the scene of a burglary. An expert witness testified the same set of teeth had bitten both pieces of cheese. The appellant in *Doyle* contended that, when he bit into the cheese at the request of the Sheriff, he made a confession and the statutory warning had not been given him. The court did not agree with this contention of the appellant; the judges stated, ". . . we fail to perceive any material distinction between the case at bar and the footprint and fingerprint cases so long recognized."

In *State v. Collins*, 328 So.2d 674 (La. 1976), the defendant, during trial, was required to open his mouth to allow the jury to see if he had a lower right tooth missing. The appellant contended that when he was asked to open his mouth and reveal his lower jaw, his Fifth Amendment rights were violated. The Supreme Court of Louisiana held: "Requiring a defendant to be observed is demonstrative evidence, and the practice does not violate the defendant's Fifth Amendment right against self-incrimination."

In *People v. Allah*, 84 Misc.2d 500, 376 N.Y.S.2d 399 (1975), a New York court concluded

> . . . that the taking of such dental impression is simply a form of obtaining real or physical evidence which in no way violates the Fourth or Fifth Amendment

privileges against unreasonable searches or seizures nor against self-incrimination. . . . Neither does it involve such an investigation of the body as to violate fundamental standards of fairness. (Citations omitted).

■ We are fully aware that Article 31(b) affords members of the military service greater protection than the Fifth Amendment of the United States Constitution, but we find no case extending this increased protection to an examination of the mouth. There is no legal or logical reason to so extend Article 31(b) protection and no such protection in the Fourth and Fifth Amendments of the United States Constitution. Thus, we find no merit in this assigned error.

## VII

## THE GOVERNMENT FAILED TO PROVE THE APPELLANT'S GUILT BEYOND A REASONABLE DOUBT.

■ The evidence in this case establishes beyond reasonable doubt that Leslie Martin is dead, that her death was caused by an unlawful act of strangulation, and that the perpetrator of the act intended to kill or inflict great bodily harm. The crucial question is, "Did appellant commit this murder?" The Government's case is circumstantial and, the appellant contends, failed to prove his guilt beyond a reasonable doubt.

The Government's evidence reveals a marriage in which tension existed as a result of financial difficulties partially caused by appellant's gambling: 1) He played cards 5 and 6 times a month and lost more than he won; 2) He lost $100.00 during the afternoon and evening of 6 February 1978 in a card parlor prior to his return home at about 2300; 3) The strangulation death of Leslie Martin, wife of appellant, occurred in the home some time prior to 0745, 7 February 1978, and the presence of appellant at the scene was established until almost 0600 that morning; 4) Near the time of death, someone bit the left cheek of the victim, leaving a mark, and the appellant was shown to have a propensity to bite and chew on things as a means of releasing tension; 5) The appellant was identified by an expert in the field of forensic odontology as being the one whose teeth made the bite-marks on the victim.

Appellant contested much of the evidence offered by the Government witnesses, denied he killed his wife, and presented an alibi defense.

In the early morning hours of 7 February 1978, two neighbors of Corporal Martin heard a woman scream. Sergeant Gonzales did not know who uttered the scream, but indicated it came from the direction of appellant's home. He stated he heard the scream at 0555, looked out his window and saw a brown automobile which he later identified as belonging to appellant. He again looked out his window at 0600 and noticed the car was gone and appellant's young son was outside crying for his father.

Mrs. Soto also heard a scream the same morning which she stated sounded like that of Leslie Martin, whose apartment was next to hers, with a common wall separating their bedrooms. Mrs. Soto placed the time of the scream at about 0640. Appellant was at his place of duty by 0630. Each witness heard only one scream and both indicated that it came from the direction of the Martins' apartment and was that of a woman. Our study of the record of trial convinces us that Sergeant Gonzales and Mrs. Soto heard the same scream. We place more credence in Sergeant Gonzales' recollection of the time than in Mrs. Soto's. Sergeant Gonzales, when he heard the scream, looked at his clock which read 0555. He got up, looked out the window, prepared for the day's activities, and was conscious of the time because he was running a little late that day, whereas Mrs. Soto was awakened by her son who wanted a glass of water and medicine, noticed the kitchen clock showed 0630, then returned to bed and a few minutes later heard a scream. It did not appear Mrs. Soto had any obligations to be any place at a particular time that morning, she was aroused from sleep, and returned to bed. The exact time, under the

circumstances, was not as important to Mrs. Soto as it was to Sergeant Gonzales, and when she got up for the day, she did not look at the clock. One aroused from sleep by a child who needs medicine and then returns to bed, we believe, is more likely to misread the time than one who notes the time, gets up, prepares for the day, keeps rechecking the time, and leaves for work. We believe Mrs. Soto probably misread the time.

Appellant testified his alarm sounded at 0545; he arose, dressed and left his quarters in "three or four minutes." Corporal Rivera testified appellant arrived at his home that morning at 0602. The exact moment of appellant's arrival is questionable and could have been as early as 0558. Sergeant Gonzales' identification of appellant's automobile was somewhat clouded during his first appearance on the witness stand. He was later recalled and clearly stated it was the appellant's automobile he had seen parked on the street at 0555 on the morning in question. His identification of the automobile was bolstered by that of an agent of the Naval Investigative Service. The information Sergeant Gonzales related to the court concerning the location of appellant's automobile on that morning is not inconsistent with appellant's own testimony pertaining to where he parked his automobile on the night of 6 February 1978. We are convinced appellant's automobile was parked on the street outside his quarters at 0555 on 7 February 1978.

The time of Leslie Martin's death figures prominently in appellant's alibi defense. The body was warm when discovered at 0745, began to cool on the way to the hospital, but was still warm when admitted to the emergency room at 0837. There were factors in this case which affected the decedent's body temperature, in addition to the time of death. The Martins slept on a waterbed which was heated on the morning of her death. Mrs. Nicholson, who discovered Leslie Martin, covered the body with a blanket and she was wrapped in the bed clothes on the way to the hospital.

Doctor Katsuyama, a forensic pathologist, testified that a waterbed heated to body temperature could result in no significant temperature loss to the body. Doctor Katsuyama, in his testimony and report, which was admitted as evidence, did not venture an opinion as to the time of death. The evidence also revealed that CPR and other emergency measures administered by rescue personnel could have effected the onset of usual body changes which occur following death.

We are convinced from the evidence in the record of trial that appellant could have been at home at the time of the murder. This conclusion brings us to the crucial evidence in the case against appellant, the bite-marks on the victim's left cheek.

Doctor Katsuyama, testifying as an expert witness, stated in his opinion Leslie Martin died as a result of asphyxiation due to strangulation. He further was of the opinion, from his examination of the body, that an armlock type of strangulation was applied and it would have been possible for the assailant, during the attack, to have inflicted the bite-marks he found on the left cheek. It was also his opinion the bite-marks had been made close to the time of the strangulation injuries.

During the latter part of 1977, the appellant sought medical attention as a result of headaches, abdominal pains, and some vomiting of blood. He was admitted to the Naval Regional Medical Center at Camp Pendleton by Lieutenant Knight, a Navy doctor. Lieutenant Knight, during the period of hospitalization, observed appellant chewing on a toothbrush at inappropriate times, such as when he was walking in the hall and in the room through the day.

Lieutenant Knight referred appellant to Lieutenant Sherman, a staff psychologist, at the Navy Regional Medical Center, for professional attention. Lieutenant Sherman related that during consultative sessions, the appellant disclosed that to let off steam he would bite and chew things; and, that when he was "up tight", anxious, he chewed on objects as a way of releasing some of his tension. This propensity by

appellant to chew on things was also noticed by Mrs. Nicholson when she visited in the Martin home.

Doctor Sperber, a civilian dentist and a forensic odontologist, testified as an expert witness and identified the appellant, with a reasonable dental certainty, as the individual who had inflicted the bite-mark on the deceased. Doctor Sperber's identification and work was strongly attacked by Doctor Beckstead, another forensic odontologist. Doctor Sperber and Doctor Beckstead both recognized the other as an expert in this field, and generally agreed on the state of development of bite-mark identification, techniques and procedures that should be used, and that the empirical evidence now existing did not establish the uniqueness of bite-marks to the extent of fingerprints. Doctor Beckstead questioned the quality and accuracy of Doctor Sperber's work, and related how he would have done some things differently had he made the examination and comparison. Doctor Sperber was satisfied to a reasonable certainty that the bite-mark on the victim's cheek was made by the appellant; however, Doctor Beckstead, looking at Doctor Sperber's photographs, models, and other means of proof, did not believe the appellant could be identified as the one making the bite-mark, but felt that he could not be excluded as one that may have caused the injury.

We note in evaluating the testimony of these experts that Doctor Sperber examined the marks on the body, took numerous black and white, as well as colored, photographs of the area on 8 and 9 February, took copies of appellant's dentition, and made many comparisons in arriving at his opinion. He then prepared a videotape explaining to the members the step-by-step process by which he arrived at his opinion. Doctor Beckstead did not view the body, but based his opinion on a critique of Doctor Sperber's work. These gentlemen both displayed impressive qualifications, training, and experience in their field of expertise and both ably acquitted themselves during direct and cross-examination. The members no doubt fully considered and weighed the content of the expert testimony and opinions in reaching a verdict in this case.

The case *sub judice*, as the other cases reported in which bite-mark evidence constituted part of the Government's evidence, did not depend alone on that identification. Our consideration of all the evidence presented by the Government convinces us of appellant's guilt beyond a reasonable doubt, as it did the members of the court. We find no error during trial which has resulted in substantial prejudice to the rights of the appellant.

Accordingly, the findings and sentence as approved by the convening authority are approved.

Chief Judge CEDARBURG concurs.

ROOT, Judge (concurring):

Although, because of the current state of decisional law, I am in reluctant concurrence with the decision of my brothers in this case, I am constrained to comment on what I perceive to be a conflict between certain rights guaranteed by the Constitution of the United States.

The appellant, in the assigned error first discussed by the majority, complains:

THE GENERAL COURT–MARTIAL CONVENING AUTHORITY ABUSED HIS DISCRETION WHEN HE REFUSED TO GIVE HODGE A TESTIMONIAL GRANT OF IMMUNITY.

To review some of the facts summarized by the majority, it should be recalled that the bed in which Mrs. Martin, the deceased, was found was a heated waterbed, and that when the body was discovered by a neighbor, the neighbor partially covered the body with bedclothes. This factor made it very difficult to establish a time of death with any degree of certainty. The appellant in this case was known to be on his way to work at 0558 on the morning of the murder, and arrived at work at about 0630. (See testimony of Corporal Rivera, R.612 *et seq.*). Appellant was seen at work by Sergeant Sundeen between 0620 and 0630 (R.621). Two witnesses testified to having heard a

scream from the direction of the Martin quarters on the morning in question. One estimated the time to be about 0555 (R.336), and the other estimated the time of the scream to be about 0640. During the preliminary stages of the trial, the appellant petitioned the military judge to admit evidence of lie detector tests. The proposed evidence would reflect that appellant had undergone four different polygraph examinations by a qualified operator, the results of which showed a lack of deception, consistent with appellant's claim of no criminal responsibility for the death of his wife. The military judge denied the motion and the exculpatory polygraph results were not admitted (R.108, Appellate Defense Exhibit Q). On the other hand, Corporal Hodge, a neighbor, was not required to work on the day in question and was out of his house from about 0730 until 0810 (Appellate Defense Exhibit W). The record does not reveal his whereabouts at the time the scream was heard. During the trial it was stipulated by trial and defense counsel that Corporal Hodge had been administered a polygraph test by a qualified operator and that, in the opinion of the operator, Corporal Hodge was deceptive in his responses to all relevant questions (Appellate Defense Exhibit KK).

With this background, the appellant called Corporal Hodge during an Article 39(a), Uniform Code of Military Justice, session of the court as a defense witness for the obvious purpose of attempting to obtain relevant information pertaining to the offense for which he was being tried. Corporal Hodge, quite understandably perhaps, declined to answer nearly all the questions of the defense on the ground that he wished "to invoke his Article 31(b) Rights [sic]". The military judge upheld the right of Corporal Hodge to invoke his statutory shield. Although I question the basis for the judge's action in regard to certain of the questions the answers to which did not appear to be incriminatory, I do not here indulge an impulse to hold the judge guilty of an abuse of discretion because the questions which I consider innocuous also would not appear to aid the appellant's cause and

because I understand that the rights given pursuant to Article 31(b) are broader in scope than are the rights guaranteed by the Fifth Amendment to the Constitution. United States v. Jordan, 7 U.S.C.M.A. 452, 22 C.M.R. 242 (1957). The military judge refused to order Corporal Hodge to answer the questions of the defense, but, sua sponte, directed the trial counsel to place the matter before the convening authority to determine whether that authority would grant testimonial immunity to Corporal Hodge, so that appellant might have the benefit of whatever knowledge Corporal Hodge had of the crime. The convening authority declined to grant such immunity.

The Fifth Amendment to the Constitution contains the following admonition: ". . . nor shall [he] be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; . . ." The Sixth Amendment to the Constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right . . to have compulsory process for obtaining witnesses in his favor . . .".

It has long been held that the Government is not required to grant immunity to a prosecution witness for a defendant. United States v. Bautista, 509 F.2d 675 (9th Cir. 1975), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); United States v. Jenkins, 470 F.2d 1061 (8th Cir. 1972), cert. denied, 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973); United States v. Beasley, 550 F.2d 261 (5th Cir. 1977), cert. denied, 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); United States v. Smith, 542 F.2d 711 (7th Cir. 1976). I have found no cases, however, in which the Supreme Court has specifically addressed the conflicting Constitutional guarantees which effect this issue.

In a narcotics case involving a similar factual situation, Circuit Judge Burger, writing for an undivided United States Court of Appeals for the District of Columbia Circuit, held against the appellant, saying that "The Government does not suggest that Congress could not provide for a proce-

dure giving a defendant a comparable right to compel testimony, but only that Congress has not done so." However, in a footnote he adds:

> We might have quite different, and more difficult, problems had the Government in this case secured testimony from one eyewitness by granting him immunity while declining to seek an immunity grant for Scott to free him from possible incrimination to testify for Earl. That situation would vividly dramatize an argument on behalf of Earl that the statute *as applied* denied him due process. Arguments could be advanced that in the particular case the Government could not use the immunity statute for its advantage unless Congress made the same mechanism available to the accused. Here we are asked in effect to rewrite a statute so as to make available to the accused a procedure which Congress granted only to the Government.

*Earl v. United States*, 361 F.2d 531, 534 n.1 (D.C.Cir.1966) (Emphasis in original text).

In another case, the United States Court of Appeals for the Ninth Circuit held:

> To interpret the Fifth and Sixth Amendments as conferring on the defendant the power to demand immunity for co-defendants, potential co-defendants, or others whom the government might in its discretion wish to prosecute would unacceptably alter the historic role of the Executive Branch in criminal prosecutions. Of course, whatever power the government possesses may not be exercised in a manner which denies the defendant the due process guaranteed by the Fifth Amendment. . . . The key question, then, is whether appellant was denied a fair trial because of the government's refusal to seek immunity for defense witnesses. . . . We are not convinced that appellant was denied a fair trial in this case. *The testimony sought by appellant was cumulative of the testimony of other witnesses.* The jury had before it all the facts and claims appellant intended to elicit from the witnesses for whom he sought immunity. The trial was not rendered unfair because

of the absence of these witnesses' testimony, and appellant was therefore not denied due process.

*United States v. Alessio*, 528 F.2d 1079 (9th Cir. 1976), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976) (Emphasis added). In *Alessio*, the Government sought and obtained immunity for one prosecution witness.

In *United States v. Herman*, 589 F.2d 1191 (3d Cir. 1978), a recent decision of the United States Court of Appeals, Third Circuit, the court held:

> . . . we conclude that the federal immunity statute cannot legitimately be construed to authorize judicial review of the prosecutorial decision not to immunize a defense witness. Nor do we think that this construction of the statute raises any constitutional difficulties. We note, first, that the statute cannot be attacked on the ground that it unconstitutionally discriminates against defendants by making immunity available only in the discretion of the prosecution. Due process has never yet been held to require that the defendant be permitted to marshal precisely the same investigative and legal resources as the prosecution, and Congress could legitimately have concluded that the defendant should not be empowered by statute to impose upon the prosecution the burden of an unwanted grant of immunity.

*Id.* at 1203.

In a strong dissent in *Herman*, however, Circuit Judge Garth makes an interesting point:

> The analysis is quite different, however, when it is the criminal defendant, and not the government, who desires immunity for a witness. The defendant has no authority to confer such immunity. Rather, the defendant must hope that the government will exercise its statutory authority to obtain immunity for the witness whose testimony the defendant desires. In such a situation, the court must be concerned with the public interest determination and exercise of discretion of

the United States Attorney. First, there is an obvious conflict of interest between the government and the criminal defendant. On this basis alone, a court must be suspicious of the government's refusal to grant immunity to a witness who seemingly has relevant, probative, and exculpatory testimony to offer. Second, if a criminal defendant's only exculpatory witness does not testify because of his fifth amendment privilege, the fact-finder will be denied evidence highly probative of the guilt or innocence of the defendant. Not only will the trial process be less accurate and reliable, but it will be less fair because the defendant will have been prevented from fully presenting the case for his innocence. . . .

. . . Since the United States Attorney's decision not to seek immunity for a defense witness will implicate the quality of the judicial process, the judicial branch has a keen interest in assuring that the discretionary power to grant immunity is not abused. Furthermore, a grant of immunity to a defendant's witness would not substantially affect the government's initial investigation and preparation of its case against the defendant. Of course the government may choose to respond to the testimony offered by a defendant's immunized witness, but it need not do so. And in any event, responding to defenses raised by a criminal defendant is something the government must do in the course of any criminal prosecution. The grant of immunity may concededly have some effect on the government's ability subsequently to prosecute the immunized witness. Although this factor is deserving of consideration, the Supreme Court has emphasized that "immunity from use and derivative use 'leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege' in the absence of a grant of immunity." *Kastigar v. United States,* 406 U.S. [441] at 458–59, 92 S.Ct. [1653] at 1664, 32 L.Ed.2d 212. Since the grant of use immunity will not necessarily impair subsequent prosecution of an immunized witness, I conclude that separation of powers concerns are not so fundamentally trenched upon as to preclude judicial review of the government's refusal to seek immunity for a defense witness.

*Id.* at 1211.

I am keenly aware that there was no offer of proof at trial that Corporal Hodge had killed appellant's wife and that his testimony would so show, nor even that Corporal Hodge was a participant in such killing. This record does not show precisely what Corporal Hodge's knowledge was; however, there is evidence to establish that Corporal Hodge was deceptive in his responses to all relevant questions. There is some evidence that he could have been present at the time of the slaying. In any event, without a grant of immunity, the grant of which was solely in the discretion of the Government, the witness's testimony was effectively lost to the appellant, since only the Government possessed the key to unlocking Hodge's mouth. Of what value, then, is that portion of the Sixth Amendment which guarantees an accused "compulsory process for obtaining witnesses in his favor"? Is it not mockery to guarantee the presence of a witness, when the accused is not provided the means to elicit testimony from this witness? Can we safely hold that in the circumstances of this case there is no reasonable doubt that the testimony, unavailable to the appellant without the Government's assistance, would not have exonerated or partially exonerated the appellant in the unfortunate death of his wife?

The Court of Military Appeals has held that:

. . . before an error founded solely upon the federal constitution can be held harmless under Article 59(a), the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *See Chapman v. California,* [386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).]

*United States v. Ward,* 23 U.S.C.M.A. 572, 50 C.M.R. 837, 841 (1975).

Although I believe that the majority has correctly decided this case in the light of current overwhelming decisional law, I am constrained to add that if ever a Constitutional principle needed an authoritative interpretation by the United States Supreme Court, this is it.

Before CEDARBURG, C. J., and FERRELL and DONOVAN, JJ.

## ON RECONSIDERATION

FERRELL, Judge:

This Court decided the case *sub judice* on 7 August 1979, in which decision the findings and sentence as approved by the convening authority were approved. Appellant, on 17 August 1979, moved for reconsideration and for an enlargement of time in which to file a brief in support of his motion. We granted the requested enlargement and ordered the brief to be filed by 17 September 1979. Thereafter, the Court granted four further enlargements of time; appellant's brief was filed on 4 January 1980. We heard oral argument on appellant's Motion For Reconsideration on 12 February 1980.

Appellant in his Motion For Reconsideration presented the following issues:

WAS THE DECISION OF THIS HONORABLE COURT OF 7 AUGUST 1979 PREDICATED ON SUBSTANTIAL ERROR AS TO LAW OR FACT IN THAT:

### I

THE NAVY COURT OF MILITARY REVIEW OPINION INCORRECTLY HELD THAT APPELLANT LACKED STANDING TO CHALLENGE THE CONVENING AUTHORITY'S REFUSAL TO COMPEL THE TESTIMONY OF A KEY DEFENSE WITNESS AND THAT THE CONVENING AUTHORITY'S REFUSAL WAS NOT AN ABUSE OR DISCRETION IN THAT:

A. THE OPINION ERRONEOUSLY RELIED ON CIVILIAN COURT INTERPRETATIONS OF FEDERAL CIVILIAN IMMUNITY STATUTES, WHICH DO NOT APPLY TO TESTIMONIAL IMMUNITY OF MILITARY WITNESSES AT COURTS–MARTIAL, TO DENY APPELLANT STANDING TO CHALLENGE THE CONVENING AUTHORITY'S DECISION.

B. IF FEDERAL CIVILIAN STATUTES FOR WITNESS IMMUNITY DO APPLY TO COURTS–MARTIAL, THE CONVENING AUTHORITY ABUSED HIS DISCRETION BY FAILING TO COMPLY WITH THE STATUTORILY MANDATED PROCEDURES AND STANDARDS FOR DECIDING WHETHER TO GRANT IMMUNITY TO THE WITNESS UPON DEFENSE REQUEST.

C. WHETHER MILITARY REGULATIONS OR THE CIVILIAN STANDARDS FOR WITNESS IMMUNITY APPLY TO THIS CASE, APPELLANT AS A MILITARY ACCUSED AT COURT–MARTIAL, HAS STANDING TO INSIST, UNDER THE FACTS OF THIS CASE, THAT A VITAL AND MATERIAL MILITARY WITNESS BE IMMUNIZED OR, IF THE CONVENING AUTHORITY DECLINES TO GRANT IMMUNITY, THAT THE COURT–MARTIAL PROCEEDINGS BE ABATED.

### II

THE TESTIMONY OF SSGT TURNER THAT SGT GONZALES HAD INDICATED TO HIM THAT SGT GONZALES COULD IDENTIFY AS APPELLANT'S AN AUTOMOBILE SEEN BY SGT GONZALES NEAR THE SCENE OF THE CRIME

A. WAS INADMISSIBLE UNDER ANY THEORY OF EVIDENCE, AND

B. THE MEMBERS' EXPOSURE TO THIS INADMISSIBLE TESTIMONY PREJUDICED APPELLANT. (*Compare Martin,* at 736).

## III

THE TESTIMONY OF DR. SPERBER, THE PROSECUTION'S ODONTOLOGY WITNESS, WAS INADMISSIBLE UNDER THE STANDARDS REQUIRED FOR THE RECEPTION OF EXPERT SCIENTIFIC TESTIMONY. *People v. Slone*, 76 Cal.App.3d 611, 143 Cal.Rptr. 61 (Dist.Ct.App. 1978). (*Compare Martin*, at 737–738).

## IV

THIS HONORABLE COURT WAS INCORRECT IN ITS CONCLUSION THAT SGT GONZALES, RATHER THAN MRS. SOTO, WAS ACCURATE REGARDING THE TIME OF THE SCREAM, BECAUSE IT DID NOT CONSIDER ALL THE EVIDENCE.

## V

WHETHER OR NOT THE "EVIDENCE PRESENTED AT TRIAL BY THE GOVERNMENT" PROVED APPELLANT TO BE GUILTY BEYOND A REASONABLE DOUBT, THE ENTIRE RECORD DOES NOT ESTABLISH HIS GUILT BEYOND A REASONABLE DOUBT.

## VI

THE STAFF JUDGE ADVOCATE'S REVIEW, BY FAILING TO ADVISE THE CONVENING AUTHORITY THAT HE WAS REQUIRED TO CONSIDER THE ENTIRE RECORD, INCLUDING INFORMATION NOT ADMITTED AS EVIDENCE, AND FAILING TO EXPLAIN THE TEST RESULTS TO THE CONVENING AUTHORITY, DEPRIVED APPELLANT OF A FAIR REVIEW OF HIS CASE BY THE CONVENING AUTHORITY.

We shall discuss only the first assignment of error.

Appellant, on 14 April 1980, filed a Motion For Leave To Cite Additional Authority based on *Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980). We granted that motion on 15 April 1980.

We have reconsidered our opinion of 7 August 1979 in the case *sub judice* and are convinced that our decision to approve the findings and sentence as approved by the convening authority was correct. There are certain additions, modifications, and changes in our first opinion we think need to be made; otherwise we reaffirm our prior opinion.

 In dealing with the issue pertaining to whether or not Corporal Hodge should have been given a testimonial grant of immunity, we stated that "[a]ppellate counsel, however, cites no authority in his brief which would support the conclusion that appellant has standing to base a complaint on whether or not immunity is granted to another individual." We believe the source of a general court-martial convening authority's power to grant immunity is the Uniform Code of Military Justice (UCMJ) and the *Manual for Courts-Martial, 1969 (Rev.)* (MCM), paragraph 68*h*, and not 18 USC §§ 6001–6005. This does not, however, preclude this Court from considering federal court cases for persuasive reasoning on issues pertaining to decisions which arise under either the UCMJ or the MCM. The appellate defense counsel appropriately cited to this Court, on 14 April 1980, *Virgin Islands v. Smith, supra*, and contends it is analogous to his case. The *Virgin Islands* case indicates that appellant does have standing to litigate the question of immunity for a defense witness.[1] We have also considered *Unites States v. Lenz*, 616 F.2d 960 (6th Cir. 1980), involving a situation in which the United States Attorney refused to seek use immunity for a defense witness. The court in *Lenz* stated the defendants had no compulsory-process right to have their witnesses immunized. They further stated that it was unnecessary in that case

---

1. In view of our disposition, we limit our reliance on *Virgin Islands v. Smith, supra*, to the issue of standing without adopting its specific

"conditions" by which to judge governmental inaction, such being left to future cases.

to decide whether, under the circumstances, the Government's refusal to immunize defendant's witnesses might deny the defendant his due process rights to a fair trial as the defendant failed to show that the witness would have testified and that, if he had, his testimony would have told the jury that the defendant did not participate in the offense.

■■■ The cases of *Virgin Islands v, Smith* and *United States v. Lenz, supra,* persuade us that the portion of our opinion concerning the issue of immunity for a defense witness should not contain the statement pertaining to a lack of standing to raise the issue by the appellant. The strong desire for justice within our system convinces us that if a purported defense witness did possess exculpatory knowledge, the Government's refusal to grant testimonial immunity should be balanced against the Government's justification for withholding that immunity. The record of this case, however, including the out of court statements of Corporal Hodge, are not clearly exculpatory of the appellant.[2] The question of testimonial immunity was presented to the convening authority pursuant to and in

accordance with the military judge's instruction. The convening authority consulted with his staff judge advocate and, after hearing what had transpired in court and what a testimonial grant of immunity entailed, declined to issue a grant of immunity. We find nothing in the record to indicate the convening authority was misled as to his authority to issue the grant nor that the decision involved any sort of gamesmanship to assist the Government. We therefore find no error in the convening authority's declination to issue Corporal Hodge a testimonial grant of immunity.

Subject to the foregoing, the opinion of this Court in the case *sub judice*, decided 7 August 1979, is approved as the decision of this Court.

Chief Judge CEDARBURG and Judge DONOVAN concur.

---

2. Appellate Defense Exhibit W, entitled Results of Interview with Bill W. Hodge, (witness), as recorded by Special Agent Carroll F. Egbert, Jr., on 7 February 1978. Appellate Defense Exhibit Z, a signed statement by Corporal Hodge taken by NIS, dated 20 April 1978. Appellate Defense Exhibit AA, a signed statement by Corporal Hodge, taken by NIS, dated 21 April 1978. During an Article 39(a), UCMJ, session of appellant's court-martial, Corporal Hodge was placed on the stand and defense counsel asked Corporal Hodge the questions eliciting the information he wanted to present to the members. Corporal Hodge refused to answer all pertinent questions, asserting his Article 31, UCMJ, rights. Corporal Hodge, during a pretrial interview conducted by defense counsel, furnished the information they were seeking. The military judge mentioned the possibility of a stipulation of what Corporal Hodge would say if he testified, but no further information on this suggestion was forthcoming during the trial. The defense counsel offered no appellate exhibits purporting to show the information they obtained from Corporal Hodge during the pretrial interview.