Mr. Justice WOODBURY
 

 delivered the opinion of the court.
 

 The original action in this case was trespass by a marine in the Exploring Expedition against its commanding officer.
 

 It will be seen, by the statement of the case, that the injury complained of was a punishment inflicted on the plaintiff by the defendant, in November, 1840, near the Sandwich Islands, for disobedience of orders, or a refusal to perform duty when directed.
 

 The plaintiff claimed, that the term for which he was bound to serve as a marine had then expired; that the defendant had no right or justification to detain him longer on board; and that, his refusal to do duty longer being the only reason, and an insufficient one, for punishing him at all, under such circumstances he was entitled to recover damages of the defendant for subjecting him to receive twelve lashes, and for a repetition of the punishment on a subsequent day, after another request and refusal by him to obey. And also, iri the mean time, for putting him in irons, and confining him in a native prison on the island of Oahu.
 

 The defendant pleaded the general issue; and by agreement of parties, any special matter was allowed to be given in evidence under that issue.
 

 Various questions of law arose during the trial, which are presented on the record in nine separate bills of exceptions by the defendant, and one by the plaintiff. Some of them are of an ordinary character ; but others possess much interest, and are important in their consequences, not only to these parties, but to the government and the community at large. ■
 

 .In a public enterprise like the Exploring Expedition, specially authorized by Congress in 1836, (see Act of Congress of 14th May, 1836,
 
 5
 
 Statutes at Large, 29, sec. 2,) for purposes of commerce and science, very valuable to the country,- and not en
 
 *123
 
 tirely without interest to most of the civilized world, it was essential to secure it from being defeated by any discharge of the crews before its great objects were accomplished, or by any want of proper authority, discretionary or otherwise, in the commander, to insure, if possible, a successful issue to the enterprise.
 

 It is not to be lost sight of, however, and will be. explained' more fully hereafter, that, while the chief agent of the government, ■ in so important a trust, when conducting with skill, fidelity, and energy, is to be protected under mere errors of judgment in the discharge of his duties, yet' he is not to be shielded from responsibility if he acts out of his authority or jurisdiction, or inflicts private injury either from malice, cruelty, or any species of oppression; founded, on considerations independent of public ends.
 

 The humblest seaman or marine is to be sheltered under the aegis of the law from any real wrong, as well as the highest in office. Considerations connected with these views are involved in most of the points ruled by the court below..
 

 But the.first and second exceptions taken by the defendant, raise incidental questions, which it may be better to dispose of separately, before proceeding to the principal points involved.
 

 One of these questions is the propriety df rejecting a letter written by the defendant, in relation to the. bounty given to the seamen and marines on their reenlisting or contracting to serve till the expedition should terminate.
 

 As this letter related to that material transaction, and was a part of the
 
 res gestee,
 
 it seems competent. Ridley
 
 v.
 
 Gyde, 9 Bingham, 349, 354; Hadley
 
 v.
 
 Carter, 8 N. Hamp. 40; Aiken
 
 v.
 
 Bemis, 2 Woodb. & Minot.
 

 It was also official correspondence of the commander in respect to official matters, and seems to have been justifiable as evidence on that account. 1 Greenleaf on Ev., sec. 491.
 

 The other question relates to the propriety of excluding the proceedings of a court-martial, which, after the return of Captain Wilkes, was convened, and acquitted him of this among other charges.
 

 We think that such proceedings were not conclusive on the plaintiff here, though a bar to subsequent indictments in courts of common law for the same offence, the parties then being the same likewise, and the tribunal acquitting competent to examine and acquit. Aspden et al.
 
 v.
 
 Nixon et al., 4 How. 467; Burnham
 
 v.
 
 Webster, 1 Woodb. & Minot, 172. And though sometimes, yet questionably, thfey have been deemed a bar to .civil suits' for damages, where the plaintiff was the prosecutor before the court-martial for that injury. Buller, N. P. 19 ; Hannaford
 
 v.
 
 Hunn, 2 Carr. & Payne, 146,
 
 semble:
 

 
 *124
 
 But. here the parties were not the same, nor the plaintiff a complainant before the court-martial, and the courts of common law have jurisdiction over the wrong, though committed at sea. Warden
 
 v.
 
 Bailey, 4 Taunt.
 
 70-75;
 
 1 MacArthur on Courts-Martial,
 
 268;
 
 Wilson
 
 v.
 
 McKenzie, 7 Hill, 95; O’Brien on Military Law, 223,
 
 semble
 
 ; Luscomb
 
 v.
 
 Prince, 12 Mass. 579.
 

 The remaining exceptions relate first to the leading question,' whether the duty of service by the plaintiff had expired when- the punishment for the disobedience of orders was inflicted.
 

 ■It is conceded that the term of his original enlistment for four years had then terminated. But after that term commenced, in 1836, Congress passed a new law, March 2d, 1837, which is supposed to reach a case of this kind, and to have justified a contract of reenlistment made by the plaintiff, which extended beyond the orig-inal term, and till after the punishment complained-of. 5 Stat. at Large, 153. ■
 

 This new law, to be sure, speaks in its title of the
 
 “
 
 enlistment of seamen ” ; but in the body of it provision is made as to the “ service of any person enlisted for the navy.”
 

 It is enacted there, that it shall be lawful to enlist persons to serve for five years, and a premium is given to such as “ shall voluntarily reenlist' to serve until the return of the vessels.” (See 3d section of act of March 2d, 1837.)
 

 . In the present instance, the Exploring Expedition having been detained in this country by obstacles in the ■ preparations, and a change in the commander, till it. became probable the original terms of service of the seamen and marines would ex- • pire before the cruise ended, the Secretary of the Navy, in September, 1837, after the above act passed, and before the squad~> ron sailed, authorized a “ bounty to the petty officers, seamen, and marines,” who would reenlist and engage, to serve during the term of the cruise. Thereupon many did so reenlist and engage to serve, and among them the plaintiff, and the bounty was paid to them all on so doing, in October, 1837.
 

 The papers admitted to show this, though excepted to by the plaintiff, we think entirely competent.
 

 After this it Avould be very, difficult to hold that the plaintiff had not/legally become liable to serve during the cruise, instead of merely his original term of four years. Because, though marines are not, in' some senses,
 
 “
 
 seamen,” .and their duties.are in some respects different, yet they are, while,employed on board public vessels, persons in the naval service, persons subject to the orders of naval officers, persons under the government of the naval code as to punishment, and pjersons .amenable to the Navy Departrnént-. Their very name
 
 *125
 
 of “ marines ” indicates the place and nature of their duties generally. And, beside the analogies of their duties in'other countries, their first creation here to serve on board ships expressly declared • them to be a part “ of the crews of each of said ships.” Act of 27th March, 1794, 1 Stat. at Large, 350, sec. 4. Their pay was also to be fixed in the same way as that of the seamen. Sec. 6, p. 351.
 

 So it was again by the act of April 27th, 1798. 1 Stat. at Large, .552. And they have ever since been associated with the navy, except when specially detailed by the President for service in the army. See Act of Congress, 11th July, 1798, 1 Stat. at Large, 595, 596.
 

 Thus paid, thus serving, and thus governed- like and with the navy, it is certainly no forced construction to consider them as embraced in the spirit of the act of 1837 by the description of persons “ enlisted for the navy.”
 

 The reason of the law on such occasions' for reenlistment applies with as much force to them as to ordinary seamen, because,. when serving on board public vessels where their first term seems likely to expire before the cruise ends, their services may, under the public necessities, be equally needed with .those of the seamen till the cruise ends ; and hence,all of them may rightfully reeulist for the cruise, at any time, in anticipation of this.
 

 Such was the construction put on this- section at the time by the Navy Department and navy officers on board, by making proposals and paying a bounty to both marines and seamen who would reénlist. ' But what is calculated to remove any doubts as to the justice of this view -is, that such was the -construction adopted by the plaintiff himself, and fully acquiesced in by his conduct in voluntarily agreeing beforehand to reenlist • for the cruise, and receiving the bounty for it, and sailing under that engagement.
 

 He thus waived any doubt, and, proceeding to sea under such new engagements supposed to be authorized by the act of Congress, he would seem- to be morally as well as legally estopped to deny their validity,' and the liabilities to duty,and to punishment consequent upon them.
 
 Volenti non jit injuria.
 

 If, however, the legal right of the commander was imperfect to require and enforce longer performance of duty under the engagements, there is another provision of the act of March, 1837, by which it seems quite clear that,-without -such vol-. untary reenlistment and engagement, the commander had power, to detain-the plaintiff after his original term expired, if, in his opinion, the public interest: required it. In the second section of the law (5 Stat. at Large, 153) it is en
 
 *126
 
 acted, that,
 
 “
 
 when the .time of service of any person enlisted for the navy shall expire while he is' on board/any of the public vessels of the United States employed on foreign service, it shall be the duty of the commanding officer to send'him to the United States in some- public or other vessel, unless his detention'shall be essential to the public interests,‘.in which case the said officer may detain, him until the vessel in which he maty be serving shall return to the -United States.” <fcc., dec.
 

 Now, considering the marines as embraced in the spirit, if not- .the exact letter, of this provision,. for reasons heretofore assigned, connected with its language and object, and their position in conjunction with the navy, it would follow that the commander, supposing the detention of the plaintiff on board “-essential to the public interests,” could rightfully direct him to remain; and in the event he did so, as is averred here, the third section of the act of 1837 provides that the .plaintiff should be “ subject in all respects to the laws and regulations for the government of the navy, until” his return to the United. States.
 
 5
 
 Stat. at Large, 153.
 

 There is still another statute, which, in our view of it, adds more strength' to these conclusions. It is an act as early as June 30th, 1834, (4 Stat. at Large, 713,) and by the second section it provides as to the marine corps, “ that the said corps shall at all times be subject to and under the laws and regulations which are or may hereafter be established for the better government of the navy,” (fee. That corps thus, in some respects, became still more closely identified with the navy. The term “ the better government of the navy ” need not be restricted to mere punishment, or to courts-martial, but may include any provision by law intended'to secure the safety of the. crew and vessel, and insure due subordination and sound discipline in any exigency of the public service. The continuance of all serving on board till the cruise ended was afterwards wisely provided for, when required “ by the public interests.” The plaintiff was, therefore, bound to submit to it. He must be presumed to have known this provision before his new contract of enlistment, and before he sailed, and indeed to have known before his first enlistment-that he was to be subject to any new. laws 'which might be enacted for the better government' of the navy, and hence that the defendant, after the act of 183^. passed, could continue, under the public exigencies,-to require the performance of duty by him" till the cruise ended, and to pli-nish him when disobedient, — if not overstepping the limits prescribed by the naval-code, and tne usages Consistent therewith which prevail in maritime service.
 
 *127
 
 Nor was it competent for him to object to this detention, as if retrospective in its operation, being authorized by an act passed after his first enlistment, because before that enlistment, Congress, June 30th, 1834. had enacted, as before cited, that the marine corps should be subject to and under the laws" and regulations which are or
 
 may be hereafter
 
 established for the better government of the navy.
 

 Having thus ascertained that the defendant had further jurisdiction over the plaintiff, and it being admitted that the latter refused to perform his orders, and, in the language of the fourteenth article, that he disobeyed the lawful orders of his superior officer (2 Stat. at Large, 47), and this on an important subject, and under circumstances likely to extend to many more of the crew, and to end in mutiny or an abandonment of the expedition, if not suppressed with promptitude and decisive energy, the next incpiiry is whether the punishment was inflicted within the license of the law.
 

 It is not the province of the judiciary to decide on the expediency or humanity of the law. but merely its existence and the conformity or non-conformity to it by the defendant.
 

 Where a private in the navy, therefore, is guilty of any .“scandalous conduct,” the commander is,,l>y the third article of the laws for the government of the navy, authorized to inflict on him twelve lashes, without the formality of a court-martial. 2 Stat. at Large;'47.
 

 If disobedience was not such conduct, but, under the fourteenth article, exposed the offender to severe punishment by a court-martial, the plaintiff could hardly complain that it was mitigated to only the twelve lashes which the captain was authorized to inflict without calling such a court, by article thirtieth, as well as article third, (Ibid., 49,) and no mom stripes were given here-for any one act of disobedience than the third and thirtieth articles warrant.
 

 Nor were they accompanied by any circumstance of unusual severity or of cruelty, either in the manner or the instrument employed. After an interval of two or three days, according to the' counts in the writ, as well as the proposed proof, and after explanations and exhortations to duty, and time given for reflection, followed by renewed disobedience, the same number of stripes was repeated, because deemed necessary in order to enforce duty.
 

 After another interval for like purposes, on a subsequent day, upon a new refusal, the punishment was again inflicted, and the plaintiff thereupon returned to duty.
 

 If precedents were needed to justify this course, it has been settled in a penal prosecution that a like act, when prohibited,
 
 *128
 
 if distinctly repeated, even on the same day, constitutes a second offence, and incurs an additional penalty. Brooks
 
 qui tam v.
 
 Milliken, 3 D. & E. 509.
 

 Again, if this disobedience could not be considered a technical offence under either of the articles already referred to, it surely is an offence in nautical service, and one of much mag - nitude at times, and the thirty-second article provides that all crimes committed by.persons belonging to the navy, which aré not specified in the foregoing articles, shall be punished according to the laws and customs in such cases at sea. 2 Stat. at Large, 49.
 

 In the discipline of the merchant service, where an act of disobedience is persisted in, and endangers the due subordination of others, the captain is justified, not only in punishing personally, but in resorting to any reasonable measures necessary to produce submission and safety. See Cobley
 
 v.
 
 Fuller, 2 Woodb. & Min., and cases there cited, and 9 Law Reporter, 386.
 

 Under this portion of the inquiry arises also the question as to the ruling about putting the plaintiff in irons, and about the confine'tnent of him on shoré in a prison of the natives..
 

 This appears to have been done under the same aspect of the case, looking to the preservation of sound discipline, and the safe imprisonment of the plaintiff till he consented to return to his duties.
 

 It appears that several other marines in the squadron were taking like insubordinate ground with the plaintiff, and that •the escape of two prisoners confined on board had already been allowed ; that many more appeared anxious to quit the vessels, doubtless under the seductive attractions of the islands near; that several of the officers and men were engaged at a distance in making scientific observations ; and that, under such circumstances, a confinement of the plaintiff on shore for a few days might be a prudent precaution to prevent a defeat of the chief objects of the expedition,
 

 This, therefore, without proof of malice, is not actionable, nor does it amount to putting a seaman - on shore in a foreign country to desert him there, contrary to the act of Congress, as that must be done, maliciously, and then is properly punishable by statute, no less than on principles of admiralty law. (4 Statutes at Large, 117, sec. 10; Abbott-on Shipping, 177 ; Jay
 
 v.
 
 Allen, 1 Woodb. & Min. 268; United States». Netcher, 1 .Story, 307.)." But if it was only to imprison him there for a few days, and, under all the circumstances, was considered by the defendant to be with more propriety and safety than in the squadron, it was justifiable, unless accompanied by malice.
 
 *129
 
 (The William Harris, Ware, 367, and The Nimrod, ib. 9; Wilson
 
 v.
 
 The Mary, Gilpin, 31; 3 Kent, Coni. 182.)
 

 As to the cleanliness of the prison, the healthfulness of the food, and the general treatment while there,'" the evidence is contradictory, and is not now a matter for onr decision.
 

 The only remaining consideration, in order to dispose of all which is left in any of the exceptions, is the competency of the commander to decide on these various questions without being amenable to the plaintiif in an action at law for any mere error of judgment in the exercise of his discretion,, which may have .been involuntarily committed under the exigencies of the moment.
 

 ( ■
 
 In order to settle this point correctly, it being-in itself a very important one, as well as running through several.of the exceptions, it will be' necessary to advert to the circumstances, that Captain Wilkes was not acting here in a private capacity and for private purposes; .but, on the contrary, the responsible duties he was performing were imposed on him by the government as a public officer. In the next place, those duties were not voluntarily sought or assumed, but met and dis- / charged in the routine of his honorable and gallant profession, / and under high responsibilities for any omission or neglect on his part, instead of being a volunteer, as in most of the cases of collectors and sheriffs made liable. (2 Strange, 820; .6 D. & E. 443.) Now, in respect to those compulsory duties, whether in reénlisting or detaining on board, or punishing or imprisoning on shore, while arduously endeavouring to perform them in such a manner as might advance the science and commerce and glory of his country, rather than his own personal designs, ¿‘public officer, invested with certain discretionary powers, never has been, and never should be, made answerable for any injury, when acting within the scope of his ( authority, and not influenced by malice) corruption, or cruelty. ( See the cases hereafter cited.)
 

 Nor can a mandamus issue to such an officer, if .he is intrusted with discretion over the subject-matter., (Paulding
 
 v.
 
 Decatur, 14 Peters, 497; Brashear
 
 v.
 
 Mason, 6 How. 102.)
 

 His position, in such case, in many respects, becomes
 
 quasi
 
 judicial, and is not ministerial, as in several other cases of liability by mere ministerial officers. 11 Johns. 108; Kendall
 
 v.
 
 United States, 12 Peters, 516 ; Decatur
 
 v.
 
 Paulding, 14 Peters, 516.. And it is well settled that “all judicial officers, when acting on subjects within their jurisdiction, are exempted from civil prosecution for their acts.” (Evans
 
 v.
 
 Foster, 2 N. Hamp. 377; 14 Peters, 600, App.)
 

 Especially is it proper, not only that a public officer, situated
 
 *130
 
 like the defendant, be invested with a Wide discretion, but be upheld in' it, when honestly exercising, and not transcending, it as to discipline in such remote places, on such a long and dangerous cruise, among such savage islands and oceans, and with the safety of so many lives and the respectability and honor of his country’s flag in charge.
 

 In such a critical position, his reasons for action, one way’ or another, are often the fruits of his own observation, and not susceptible of technical proof on his part. No review of his , decisions, ,if within his jurisdiction, is conferred by law on
 
 j
 
 either courts, or juries, or subordinates, and, as this court held in another case, it sometimes happens that “ a prompt and un- ■ hesitating obedience to orders is indispensable to the complete / attainment of the object.”' “While subordinate officers or / soldiers are pausing to consider whether they ought to obey, or. j are scrupulously weighing the evidence of the fact upon which the commander-in-chief exercises the right to demand their services, the hostile enterprise may be accomplished without the means of resistance.”. 12 .Wheaton, 30.
 

 Hence, while an officer acts within the limits of that discretion, the same law which gives it to him will protect him in the exercise of it. But for acts beyond his jurisdiction, or attended by circumstances of excessive severity, arising from ill-will, a depraved disposition, or vindictive feeling, he can claim no exemption, and should be allowed none under color of his office, however elevated or however -humble the victim. (2 Carr. &. Payne, 158, note; 4 Taunton, 67.)
 

 When not offending under such circumstances, his justification does not rest on the general ground of vindicating a trespass in private life, and between those not acting officially and not with a discretion. Because- then, acts of violence being first proved, the person using them must go forward next, and show the moderation or justification of the blows used. (2 Greenleaf on Ev., sec. 99.)
 

 The chief mistake below was in looking only
 
 to
 
 such cases as a guide. For the justification rr sts here on a rule of law entirety different, though well settled, and is, that the acts of a public officer on public matters, within his jurisdiction, and where he has a discretion, are to be presumed legal, till shown by others to be unjustifiable. (Gidley
 
 v.
 
 Palmerston, 7 Moore, 111; Vanderheyden
 
 v.
 
 Young, 11 Johns. 150; 6 Har. &. Johns. 329; Martin
 
 v.
 
 Mott, 12 Wheaton, 31.)
 

 This, too, is not on the principle merely that innocence and doing right are to be presumed, till the contrary is shown. (1 Greenl., sec. .35-37.) -But that the officer, being - intrusted with a .discretion for public purposes, is not to be punished
 
 *131
 
 for the exercise of it, unless it is first proved against him, either that he exercised the power confided in cases without his jurisdiction, or in a manner not confided to him, as with malice, cruelty, or wilful oppression, or, in the words of Lord Mansfield,_ in Wall
 
 v.
 
 McNamara, that he exercised it as “ if the heart is ^ wrong.” (2 Carr. & Payne, 158, note.) In short, it is not enough to show he committed an error in judgment-, but it must have been a malicious and wilful error. Harman
 
 v.
 
 Tappenden et al., 1 East, 562, 565, note.
 

 It may not be without some benefit, in a case of so much interest as this, to refer a moment further to one or two particular precedents in England and this country, and even in this court, in illustration of the soundness of these positions.
 

 Thus in Drewe
 
 v.
 
 Coulton, 1 East, 562, note, which was an action against the defendant, who was'a public returning officer, for refusing a vote, Wilson, J. says: — “ This is, in the nature of it, an action for misbehaviour by a public officer in his duty. Now, I think that it cannot be called misbehaviour unless maliciously and wilfully done, and that the action will not lie for a mistake in law.” “ By
 
 wilful
 
 I understand contrary to a man’s own conviction.”
 

 “ In very few instances is an officer answerable for what he does to the best of his judgment in cases where he is compellar ble to act, but the action lies where the officer has an option whether he will act or no.” (See these last cases collected in Seaman
 
 v.
 
 Patten, 2 Caines, 313, 315.)
 

 In a case in this country, Jenkins
 
 v.
 
 Waldron, 11 Johns. 121, Spencer, J. says, for the whole court, on a state of facts much like the case in East: —
 
 “
 
 It would, in our opinion, be opposed to all the principles of law, justice, and sound policy, to hold that officers called upon, to exercise their deliberate judgments are answerable for a mistake in law, either civilly or criminally, when their motives are pure, and untainted with fraud or malice.” Similar views were again expressed by the same court in the same volume, (p. 160,) in Vanderheyden
 
 v.
 
 Young. And in a like case, the Supreme Court of New Hampshire recognized a like principle. “ It is true,” said the chief justice for jthe court,
 
 “
 
 that moderators may decide wrongly with the best J intentions, and then the party will be without remedy. And so may a court and jury decide wrongly, and then the party will also be without remedy.” But there is no liability in such case without malice alleged and proved. Wheeler
 
 v.
 
 Patterson, 1 N. Hamp. 90.
 

 Finally, in this court, like views were expressed, through Justice Story, in Martin
 
 v.
 
 Mott, 12 Wheat. 31: — “Whenever a statute gives a discretionary power to any person, to be
 
 *132
 
 exercised by him. upon his own opinion of certain facts, it is a sound rule of construction that the statutes constitute him the sole and exclusive judge of the existence of theser facts.” “ Every public officer is. presumed to act in obedience to his duty; until'the contrary is shown.”
 

 Under these, established principles and precedents, it will be seen that the rulings below must be held erroneous whenever the court departed from them, and required the defendant, as on several occasions, to go forward, and in the first instance to prove details rebutting any error or excess.
 

 As, for illustration, to prove in the outset facts showing a necessity to detain the plaintiff, before the latter had offered any evidence it was done from malfce or without cause; or to prove that the prison on shore- was safer and more suitable for the plaintiff’s confinement than the vessels, under the peculiar circumstances then existing, until' the plaintiff • had first shown that, no discretion existed in the defendant to place him there, or that he did-it
 
 mala fide,
 
 or for purposes of cruelty and oppression; or to prove that the punishment inflicted was not immoderate, and not unreasonable, when it is admitted to have been within the limits of his discretion, as confided to him by the articles -for the government of the navy. On the contrary, as has been shown, all his acts within the limits of the discretion given to him are to be regarded as
 
 prima facie
 
 right till the opposite party disprove this presumption.
 

 The judgment below must therefore be reversed, and a
 
 venire de novo
 
 awarded, and the new trial be governed by the principles here decided.