**UNITED STATES, Appellee,**

v.

**Sergeant Jose A. MARTINEZ,
080–42–7356, United States
Army, Appellant.**

**CM 443957.**

U.S. Army Court of Military Review.

7 Dec. 1984.

Captain Donna Chapin Maizel, JAGC, argued the cause for appellant. With her on the brief were Toby H. Hollander, Esquire, Lieutenant Colonel William P. Heaston, JAGC, and Major Edwin D. Selby, JAGC.

Captain John J. Park, Jr., JAGC, argued the cause for appellee. With him on the brief were Colonel James Kucera, JAGC, Lieutenant Colonel Adrian J. Gravelle, JAGC, and Major Joseph A. Rehyansky, JAGC.

Before SUTER, RABY, and COHEN, Appellate Military Judges.

## OPINION OF THE COURT

RABY, Senior Judge:

Following the presentation of evidence with respect to all specifications as to which the appellant entered pleas (several specifications were dismissed prior to pleas for failure to state offenses), the appellant was acquitted of two specifications each alleging oral sodomy and attempted anal sodomy, and of one specification each alleging obstruction of justice, bribery, indecent acts with a male servicemember, communication of a threat, and solicitation of a subordinate to wrongfully introduce marijuana onto a military installation. Contrary to his pleas, however, appellant was convicted of three specifications of using marijuana, one specification of transferring marijuana to a subordinate enlisted servicemember, one specification of soliciting an enlisted servicemember to wrongfully introduce marijuana onto a military installation, one specification of unlawful assault consummated by battery of an enlisted servicemember, and two specifications of obstructing justice. He was sentenced to a dishonorable discharge, confinement at hard labor for six years, forfeiture of all pay and allowances, and reduction to the grade of Private (E–1). The convening authority approved the sentence as adjudged except for the period of confinement, which he reduced to five years and eight months to give the accused appropriate credit for 103 days of illegal pretrial confinement.

We have considered all the issues personally raised by appellant and those briefed

by his counsel. Some of these issues warrant discussion.

By post-trial affidavits, appellant raises certain factual allegations for the first time before this Court, including his "homosexual observation" status during both pretrial and post-trial confinement. Appellant claims that while in pretrial confinement he was "intimidated" into waiving his right to segregation from post-trial confinees and that he suffered manifest emotional distress because of the insensitive manner in which this status was announced and implemented.[1] His assertions regarding his emotional reaction to his confinement status are supported, in part, by the following statement of an Army psychiatrist:

> [Appellant] was especially upset about being singled out and treated as a homosexual even after he was acquitted of these charges. It seemed that his serious depression and suicide potential was partially due to the close observation and resulting tensions this caused.... I believe this special treatment added to his feelings of being singled out for mistreatment and increased symptoms of depression and suicide potential. However, his charges, conviction and sentencing were also important causative factors in the depression he experienced.

Defense Appellate Exhibit D.

Following his placement in pretrial confinement on 7 October 1982, appellant went into a state of mental shock. He was first placed in a suicide observation status and then in a homosexual observation status. An inspection record which identified appellant's confinement status, DD Form 509 (Inspection Record of Prisoners), described as a "509 form", was posted six feet outside appellant's cell. Prisoner formations were held at this location. As enlisted prisoners had access to this notice, the appellant, a non-commissioned officer, was humiliated and subjected to degrading comments. Following appellant's request that the DD Form 509 be covered or placed in the guard cage, the notice was covered but was not moved. Because of his status, appellant was kept alone in a two-man cell, took showers alone, sat on a special bench when watching movies or television, and was segregated from other prisoners under close and continuing observation. Although aware of the appellant's mental problems (while the appellant is sane, he has been diagnosed as having an adjustment disorder with marked anxiety and depression), the commander of the installation detention facility at Fort Lewis did not alter the appellant's status. On 18 January 1983, the appellant was acquitted of all sexual offenses with which he was charged. Notwithstanding the appellant's protestations, his confinement status remained unchanged.

Following trial (when, appellant asserts, he became totally despondent and started to plan suicide), appellant initially was placed in suicide observation status, but was soon released from that status and returned to a homosexual observation status. Two days later, appellant was notified of his pending transfer to the United States Disciplinary Barracks (USDB). Prior to transfer, appellant learned that he was scheduled to be transported to the USDB with a convicted sodomist. The night before shipment, appellant attempted suicide by ingesting pills. The following morning appellant again attempted suicide (appellant defense counsel has informed this Court that the appellant attempted this suicide by cutting his wrists) in what appellant's psychiatrist described as a "serious suicide attempt." Appellant also alleges that upon arrival at the USDB he was again required to waive his right to segregation, he lost all recreational privileges, and he was locked up for 23½ hours a day until his "C.A. (which we assume to mean convening authority's action) came

---

1. Appellant also maintains that his pretrial confinement status deprived him of his "constitutional rights to prepare [his] own defense." Defense Appellate Exhibit A. Our review of the entire record of trial fails to provide any support for this assertion and, in fact, discloses an aggressive and unfettered defense. Moreover, appellant had the opportunity to consult with his defense counsel before trial and makes no assertion that this right was impaired.

through". He was not, however, placed in administrative segregation at this facility.

## I. PRETRIAL CONFINEMENT CONDITIONS

 Appellant expressly asserts for the first time on appeal that his treatment while in pretrial confinement violated Article 13, Uniform Code of Military Justice [hereinafter cited as UCMJ], 10 U.S.C. § 813 (1982), because of the cruel and unusual stigmatization, isolation, and condemnation which he suffered due to the manner in which his pretrial confinement status was announced, implemented, and maintained. It is normally inappropriate to raise issues concerning pretrial confinement for the first time on appeal. *United States v. Gambini*, 10 M.J. 618 (A.F.C.M.R. 1980), *findings aff'd, sentence rev'd on other grounds*, 13 M.J. 423 (C.M.A.1982); *United States v. Blacquiere*, 9 M.J. 712 (A.F.C.M.R.1980), *pet. denied*, 9 M.J. 177 (C.M.A.1980). *Compare United States v. Johnson*, 41 C.M.R. 49 (C.M.A.1966); *United States v. Franklin*, 41 C.M.R. 431, 437–39 (A.C.M.R.1969). Accordingly, we find that these particular issues were waived.

 Assuming *arguendo* that appellant was subjected to illegal pretrial confinement and that the issue is viable on appeal, we find sentence reassessment nonetheless unwarranted. The record of trial clearly shows that, based upon his staff judge advocate's advice, the convening authority reduced appellant's sentence by four months to comply with the military judge's order that the accused receive "credit for 103 days served in [illegal] pretrial confinement...."[2] Further, in accordance with existing Army confinement policy, appellant has been given an additional 103 days of administrative credit for the pretrial confinement served from 7 October 1982 to 18 January 1983. Any further sentencing credit for the pretrial confinement served would constitute a windfall to the appellant.

## II. POST–TRIAL CONFINEMENT CONDITIONS

Appellant asserts that his continued segregation following court-martial constituted illegal punishment in contravention of Article 55, UCMJ, 10 U.S.C. § 855, and he seeks meaningful sentence reassessment. This issue has not been waived and is within the jurisdiction of this Court to review due to the circumscribed scope of relief sought in the assignment of error.[3]

 Although appellant couches his assignment of error in terms of a violation of Article 55,[4] it is clear that the appellant's contentions implicitly encompass an alleged violation of the eighth amendment of the United States Constitution. The eighth amendment applies to court-martial procedures. *United States v. Rojas*, 15 M.J. 902, 927 (N.M.C.M.R.1983), *rev'd on other grounds*, 17 M.J. 154 (C.M.A.1984). However, the statutory safeguards of Article

---

**2.** During trial, defense moved to dismiss the charges based upon appellant's 103 days of illegal pretrial confinement, in that he was commingled with convicted prisoners in violation of Article 13, UCMJ, 10 U.S.C. § 813 (1982). *See United States v. Bruce*, 14 M.J. 254 (C.M.A.1982). Appellant asserted that he was forced to waive his right to segregation from post-trial prisoners. The military judge ultimately determined that the accused had served 103 days "in pretrial confinement, in violation of Article 13...." His order apparently was based on an acceptance of defense counsel's assertions that appellant had been coerced by the circumstances to sign a waiver of his right to be separated from post-trial prisoners and that appellant was compelled to work with such prisoners.

**3.** We need not and do not decide at this time the existence of or extent of this Court's jurisdiction to compel military confinement facilities to refrain from violations of either Article 55, UCMJ, or the eighth amendment to the Constitution of the United States either by tailored application of the All Writs Act, 28 U.S.C. § 1651 (1982), or by issuance of a declaratory judgment, *see* 28 U.S.C. § 2201 (1976).

**4.** Article 55, UCMJ, provides: "Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by a court-martial or inflicted upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited."

55, UCMJ, encompass all constitutional safeguards of the eighth amendment, as the former parallels the latter. *United States v. Matthews*, 13 M.J. 501, 521 at n. 10 (A.C.M.R.1982), *sentence rev'd*, 16 M.J. 354 (C.M.A.1983). Although Article 55 may provide certain additional safeguards not here applicable, *see United States v. Wappler*, 9 C.M.R. 23 (C.M.A.1953),[5] with respect to the issues at hand Article 55 provides protections comparable to those provided by the eighth amendment. *See United States v. Matthews*, 16 M.J. 354, 368 (C.M.A.1983).[6] Thus, resolution of an eighth amendment issue will perforce resolve the alleged violation of Article 55.

 As the imposition of solitary confinement has been held not to violate the Constitutional prohibition against cruel and unusual punishment *per se, see Sostre v. McGinnis*, 442 F.2d 178 (2d Cir.1971), *cert. denied sub nom*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), we must test the circumstances of this case against known constitutional standards to resolve whether violations of the eighth amendment and Article 55 have occurred. The primary test which has been applied is whether the conditions can be said to be cruel and unusual under contemporary standards of decency. *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (The proper test considers "the evolving standards of decency that mark the progress of a maturing society."); *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) ("[A]n assessment of contemporary values concerning the infliction of a challenged sanction is relevant to the application of the Eight Amendment."); *see also Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct.

2392, 2399, 69 L.Ed.2d 59 (1981); *Estelle v. Gamble*, 429 U.S. 97, 103–104, 97 S.Ct. 285, 290–291, 50 L.Ed.2d 251 (1976). In determining whether these conditions exist, no static test can be applied; courts should make informed decisions using objective factors to the maximum extent possible. *Rhodes v. Chapman*, 452 U.S. at 346, 101 S.Ct. at 2399; *see Gregg v. Georgia*, 428 U.S. at 173, 96 S.Ct. at 2925. Further, courts should consider the totality of the confinement conditions to determine whether, under existing circumstances, contemporary standards of decency have been violated. *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399 (If the totality of the circumstances establishes an "unquestioned and serious deprivation of basic human needs", that is, a deprivation of "the minimal civilized measure of life's necessities," the eighth amendment is violated.). *See also Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Factors which support such a conclusion include, but are not limited to, conditions which result in a clear and serious deprivation of basic human needs, which deprive inmates of the minimal civilized measure of life's necessities, or which result in punishment grossly disproportionate to the inmate's offenses. *See Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910); *Gregg v. Georgia*, 428 U.S. at 173, 96 S.Ct. at 2925 ("A penalty also must accord with 'the dignity of man. . . .' This means, at least, that the punishment not be 'excessive.'"); *Trop v. Dulles*, 356 U.S. at 100, 78 S.Ct. at 597; *see also Rhodes v. Chapman*, 452 U.S. at 346–47, 101 S.Ct. at 2398–2400; *Hutto v. Finney, supra.*

Appellant urges that we condemn practices involving the cruel and unusual psy-

---

**5.** To the extent that Article 55 specifically prohibits the use of certain archaic types of punishment and prohibits the use of irons except for safe custody purposes, its scope is broader on its face than the eighth amendment. *Wappler* appears to extend the scope of Article 55 even further to prohibit a court-martial from adjudging certain military punishments not expressly proscribed in the text of Article 55 which the Court speculates would not be prohibited under the eighth amendment.

**6.** There is no magical incantation hidden in the language of Article 55; it was patterned after the forty-first Article of War and was enacted to take "us out of the dark ages." Index and Legislative History, Uniform Code of Military Justice, page 1087 (U.S. Government Printing Office, 1950).

chological abuse of prisoners as readily as instances of physical abuse. "Today the eighth amendment [and Article 55] prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain.'" *Rhodes v. Chapman*, 452 U.S. at 346, 101 S.Ct. at 2399. This Court will not condone the cruel and unusual psychological abuse of prisoners. However, in situations such as this, the greatest degree of caution must be exercised. Unlike Orwellian 1984, modern society has not conquered the behavioral sciences. Allegations of crippling psychological abuse heaped upon prisoners by penal authorities are easy to assert and hard to prove or disprove. Further, although the standards for review of alleged eighth amendment and Article 55 violations involve objective tests, the degree of psychological pain actually inflicted on a prisoner by a given act can be measured only subjectively. At the same time, however, we note that appellant was administratively segregated from the general prison population. This situation alone mandates careful scrutiny under eight amendment and Article 55 standards, as such confinement could, under certain circumstances, constitute cruel and unusual punishment. *See Hutto v. Finney*, 437 U.S. at 685, 98 S.Ct. at 2570; *see also Furman v. Georgia*, 408 U.S. 238, 245, 92 S.Ct. 2726, 2729, 33 L.Ed.2d 346 (1972).

■ Turning our attention to the facts of the case at bar, we find, first, that considering the nature of the offenses of which appellant was convicted, the terms of his approved sentence, the basis for and length of his administrative segregation, and the known terms and conditions of that segregation, appellant was not subjected to punishment that was grossly disproportionate to the severity of his criminal acts.

Next we shall consider whether, under the circumstances of appellant's confinement, he was subjected to a "serious deprivation of basic human needs" by being denied "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399. We find

no such deprivation. Although appellant was kept in an observation status, primarily on the basis of his suspected homosexuality, he was not denied the minimum necessities of life. Appellant does not assert that he was denied meaningful access to food, clothing, shelter, or necessary medical care. He was provided psychiatric care and had apparent access to guards, a physician's aide or a doctor, a mental hygiene counsellor, and a chaplain who, by appellant's admission, signed the DD Form 509 by the wall of appellant's cell "once or twice daily." Appellant was allowed to shower, to be escorted around the facility for official purposes, and to watch television and movies, albeit segregated from other prisoners. The provision of and opportunity to use such facilities, services, and counselling clearly constitute substantial access to the appropriately labelled "necessities of life" and, thus, more than meet the constitutional requirement for providing a prisoner with "the minimal civilized measure of life's necessities". *Cf. Smith v. Fairman*, 690 F.2d 122, 125 (7th Cir.1982) ("Our review of the facts demonstrates that ... inmates receive adequate food and medical care. The sanitary conditions ... are reasonable.... [W]e can hardly conclude that prisoners are subjected to wanton and unnecessary inflictions of pain."). Appellant clearly has not been deprived of his basic human needs.

We find that appellant did experience an unknown degree of psychological pain as a result of his conviction and incarceration. For the sake of argument, we will assume that the degree of psychological pain he suffered as a direct result of the circumstances surrounding his administrative segregation was acute. However, the mere fact that a prisoner suffers emotionally while in confinement or that such suffering may be severe does not alone constitute a violation of the eighth amendment and Article 55. As recognized by the United States Supreme Court in *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399, "[t]o the extent that [prison] conditions are restrictive *and even harsh*, they are part of the penalty that criminal offenders pay

for their offenses against society." (Emphasis supplied.) There is no basis for finding that a constitutional or statutory violation exists merely because psychological pain has been experienced by appellant. Such a violation exists, however, if the infliction of pain was both unnecessary and wanton. This Court is aware that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification,'" *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), *citing Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976); *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Consequently, we will now test for the absence or existence of such justification by the confinement officials.

In *Rhodes v. Chapman*, 452 U.S. at 346, 101 S.Ct. at 2399, the United States Supreme Court emphasized that inquiries such as these should be based on "objective factors to the maximum possible extent." In this instance, we have access to articulated standards by which to weigh the legitimacy of the correctional authorities' conduct. Pursuant to the statutory authority of 10 U.S.C. §§ 951(c) and 3012(g) (1982), the Secretary of the Army has promulgated Army Regulation 190–47, Military Police—The United States Army Correctional System (1 Oct. 1978) [hereinafter cited as AR 190–47]. This regulation is applicable to all "Active Components and the elements of Reserve Components of the U.S. Army having the mission of operating confinement or correctional facilities." AR 190–47, paragraph 1–2. It is a well-recognized practice of modern confinement facilities to take those reasonable and necessary measures required to promote institutional security and to provide for the safety of the institution's staff and inmates. AR 190–47 recognizes the need for such measures and provides general authority for the initiation of certain restrictive procedures. AR 190–47, paragraph 7–2a, provides, in pertinent part:

The facility commander is authorized to restrict the movement and actions of prisoners and to take such other measures as are necessary to maintain control of prisoners, *protect the safety and welfare of prisoners* and others, and ensure the orderly administration of the facility.

(Emphasis supplied.) An accepted means of prisoner control is the reasonable use of administrative segregation. AR 190–47, paragraph 9–5, provides the following guidance regarding the use of this control procedure:

The confinement or correctional facility commander may authorize restriction on the movement and activity of prisoners for medical reasons, *protective custody*, the prevention of injury to the prisoner or others, *pending investigation of an alleged offense, or when an intractable prisoner's obstinance adversely affects the operation of the facility or infringes on the rights of other prisoners.* Such a restriction is not a form of punishment *and should not be confused with administrative disciplinary measures described in this chapter. Prisoners placed in administrative segregation will be advised as to the purpose of the action.*

a. Prisoners who *may* require administrative segregation *include* recognized homosexuals, those who exhibit homosexual behavior, those with psychological disorders who do not adjust to living with other prisoners, and those who otherwise cannot be controlled. They will be provided normal cell furnishings, full rations, medical care and normal privileges, including recreation, so far as health, welfare, control and physical facilities permit. . . .

b. Commanders of confinement and correctional facilities will continuously review all cases on administrative segregation in an effort to keep use of these facilities at a minimum.[7]

(Emphasis supplied.)

As AR 190–47 was duly promulgated under the statutory authority of the Secre-

---

7. AR 190–47 contains detailed policy guidance for confinement and correctional facility per-

tary of the Army, it enjoys a presumption of validity. *See United States v. Saade,* 652 F.2d 1126, 1134 n. 12 (1st Cir.1981); *cf. State ex rel. Delgado v. Romero,* 17 N.M. 81, 124 P. 649, 650 (1912). Appellant has not overcome this presumption. Moreover, examination of the stated scope, purpose, and effect of the provisions of AR 190–47 establishes that both the authority vested in confinement or correctional facility commanders to place certain classes of prisoners in administrative segregation and the policies, procedures, and guidelines pertaining thereto are reasonable on the face of the regulation.[8] Therefore, we find that these regulatory provisions are valid independent of any presumption of regulatory validity.

The validity of AR 190–47 alone, however, will not resolve whether the confinement facility commander's conduct was based on some reasonable "penological justification." His conduct must now be examined to determine whether he exceeded the authority vested in him by lawful regulation.

Decisions to administratively segregate prisoners for homosexual observation, suicide observation, or other authorized reasons, the conditions of administrative segregation, and the length of such segregation constitute official acts within the facility commander's authority. Although reasonable guidelines regarding administrative segregation are provided in AR 190–47, the decisions as to when, to whom, and for how long such segregation is imposed consistent with these guidelines are within the sound discretion of the facility commander. It has long been recognized that discretionary acts involving official matters within a military officer's jurisdiction are to be presumed legal until shown by others to

be unjustified. *Wilkes v. Dinsman,* 7 How. 89, 48 U.S. 89, 93, 137, 12 L.Ed. 618 (1849). Military officers are public officers and, as such, it also is presumed that they perform their official duties in a regular manner and in good faith, as well as in compliance with the law. 29 Am.Jur.2d *Evidence* § 171 (1967). Accordingly, official actions both of the confinement facility commanders at Fort Lewis and Fort Leavenworth and of their subordinates enjoy the above presumptions, unless the appellant can make an adequate showing to overcome these presumptions. Appellant has not established and we will not presume that the confinement facility officials entertained an express intent to punish appellant by placing him in administrative segregation under the conditions herein described. Appellant has failed to meet his appellate burden and the above presumptions of good faith, regularity, and lawful conduct remain viable. Accordingly, we conclude that appellant was not subjected to an unnecessary and wanton infliction of pain, because "penological justification" existed to support the adverse administrative measures that were taken against appellant.

Although the above special areas of inquiry reveal no violation of appellant's Article 55 and eighth amendment rights, we must now examine the totality of the circumstances surrounding his confinement to determine whether either facility commanders or their personnel departed from contemporary standards of decency, which have been described as "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. at 101, 78 S.Ct. at 598.

---

sonnel and establishes guidelines designed to protect the health, safety, and welfare of administratively restricted prisoners. *See, e.g.,* paragraphs 9–7, 9–8, and 9–11, AR 190–47. These procedures also provide for the visits of restricted prisoners by professionals such as custodial staff personnel, chaplains, and medical officers or physicians' assistants. A record of such visits and observations must be maintained on DD Form 509.

8. Even if the policy established by Army regulation is thought to be unwise, this alone will not justify judicial circumvention of the policy, absent proof that there is no reasonable basis therefor. The appellant must, consequently, establish that such a policy is arbitrary and capricious. *Cf. United States v. Eliason,* 16 Pet. 291, 41 U.S. 291, 301, 10 L.Ed. 968 (1842).

Subsequent to his conviction by a general court-martial, appellant was sentenced by the court-martial members. Imposition of this sentence was within the jurisdiction and authority of the court-martial. Article 18, UCMJ, 10 U.S.C. § 818, Manual for Courts-Martial, United States, 1969 (Revised edition) [hereinafter cited as MCM, 1969], paras. 14, 125–127. Following a sentence which includes confinement, an accused may be immediately confined in a military confinement facility. Articles 57(b) and 58(a), UCMJ, 10 U.S.C. §§ 857(b), 858(a). Upon being duly confined, appellant was subject to the lawful authority of the commander of the facility and his subordinates. *See* Articles 89, 90, and 92, UCMJ, 10 U.S.C. §§ 889, 890, 892. As stated in AR 190–47 and discussed above, a facility commander has broad authority to place a prisoner in administrative segregation for the prevention of injury to the prisoner or others. It is within the exercise of the commander's sound discretion to determine when the circumstances warrant the administrative restraint of a specific prisoner. Responsibility for confinement facility security and for the safety of both prisoners and confinement facility personnel rests ultimately with the commander. Moreover, unlike civilian confinement facility counterparts, a military confinement facility commander may be held criminally liable merely for failing to exercise due care (engaging in simple negligence) in the performance of prescribed military duties. Article 92(3), UCMJ.

It is difficult for appellate courts, even under optimum conditions, to reconstruct the exact circumstances confronting a confinement commander at any given point in the decision-making process. Thus, great deference should be paid to the decisions of the facility commander concerning matters pertaining to institutional security, safety, and the preservation of internal order and discipline. *Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). In the case at bar, appellant states that when initially informed of the pending charges, he "went into a state of emotional shock." Under these facts, it was within the facility commander's discretion to place appellant in a suicide observation status in administrative segregation.[9] Later, appellant's status was changed to homosexual observation status. As the charges pending against accused included allegations of attempted anal sodomy and nonconsensual oral sodomy, the commander's decision to change appellant's status was neither arbitrary nor capricious.[10]

Appellant maintains, however, that his administrative segregation in a homosexual observation status certainly should not have been continued after 18 January 1983, when he was acquitted of all charges relating to sexual offenses. At the outset, we note that by 18 January 1983 there was ample evidence concerning appellant's emotional state to warrant his continued administrative segregation. By his own admission, appellant communicated both orally and in writing with the facility's commander about the circumstances of his administrative segregation. Regarding appellant's placement in a homosexual observation status, AR 190–47 does require a continuous review by the facility commander to keep the use of the restrictive measure to a minimum. As the regulation does not require a formal review procedure, an informal, nonadversary evidentiary review is all that is required. *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871. Appellant's status was so reviewed on several occa-

---

9. We note that at no time was appellant subjected to disciplinary segregation. See AR 190–47 concerning disciplinary segregation policies.

10. In *Hutto v. Finney*, 437 U.S. at 681, 98 S.Ct. at 2568, there existed ample support for the District Court to characterize the routine conditions in the Arkansas prison system as constituting "a dark and evil world completely alien to the free world." Among those egregious conditions, "[h]omosexual rape was so common and uncontrolled that some potential victims dared not sleep; instead they would leave their beds and spend the night clinging to the bars nearest the guard's station." *Id.* at n. 3.

sions. These reviews did not result in a reduction of appellant's restrictions.

Appellant's belief that his acquittal with respect to the charges of sexual misconduct should estop the facility commander from continuing his administrative segregation in a homosexual observation status is erroneous. While these two matters may be related, they are not mutually exclusive. For example, there is a major difference between the standard of proof required for conviction by court-martial (proof of guilt beyond a reasonable doubt) and that required to impose or continue administrative segregation (reasonable belief that segregation is warranted). Information available to the facility commander from the appellant's prison records, the charge sheet, pretrial investigation reports, or reports from other confinement personnel may well have supported the commander's decision. Appellant has not established that the facility commander failed to consider any such relevant information in his decision-making process, and we will presume that he properly performed his duties in the absence of evidence which rebuts the presumption of regularity.

Appellant also complains of the manner in which the DD Forms 509 were displayed outside his cell. We note that when he addressed his grievance to prison officials a cover was placed over the forms. While posting the forms in a location apparently available to prisoners, to guards, and to groups touring the confinement facility may reflect poor judgment or deficient leadership, it does not rise to the level of indecent treatment necessary to constitute a violation of the eighth amendment and Article 55, UCMJ.

With respect to the indefinite duration of appellant's administrative segregation, we note that the Fort Lewis Installation Detention Facility (IDF) was only to be used for the temporary custody of the accused pending his transfer to the USDB. Considering this factor and the overall conditions of appellant's administrative segregation, we find that the indeterminate nature of appellant's restriction at the Fort Lewis IDF did not *per se* constitute a violation of the eighth amendment and Article 55, UCMJ. *See Hutto v. Finney*, 437 U.S. at 686, 98 S.Ct. at 2571.

Appellant maintains he was coerced into signing a second waiver of his right to segregation upon his arrival at the USDB. Assuming *arguendo* that this occurred, it would not constitute a violation of Article 13, UCMJ, as appellant was no longer in a pretrial confinement status. H.R.Rep. No. 97–306, 97th Cong., 1st Sess. 4, *reprinted in* 1981 U.S.Code Cong. & Ad.News 1769, 1773; *cf. United States v. Bruce*, 14 M.J. 254, 256 (C.M.A.1982). We will, however, consider both this factor and appellant's assertion that he was initially placed in "lock up" for 23½ hours each day as among the overall conditions of appellant's confinement.

Considering the totality of the circumstances surrounding the conditions of appellant's pretrial and post-trial confinement, as thoroughly discussed above, we find that these conditions did not violate contemporary standards of decency and were consistent with those standards of decency that mark the progress of a maturing society. Accordingly, this assignment of error is without merit.

### III. GRANT OF IMMUNITY TO PROSECUTION WITNESSES

■ Appellant also contends that immunity was improperly granted to certain prosecution witnesses who did not assert that they would refuse to testify without it. Two military witnesses were given immunity who previously had not declined to testify on the basis of either Article 31, UCMJ, 10 U.S.C. § 831, or the fifth amendment to the Constitution of the United States. The authority to issue grants of immunity, which was vested in the general court-martial convening authority in this case, is derived exclusively from the Executive branch. *See United States v. Martin*, 9 M.J. 731, 747 (N.C.M.R.1979), *aff'd*, 13 M.J. 66 (C.M.A.1982). Specifically, the President, by Executive Order, has vested his power to grant such immunity to certain

754

convening authorities. MCM, 1969, para. 68*h*. *See also* R.C.M. 704 and Manual for Courts-Martial, United States, 1984, App. 21, R.C.M. 704. The decision to grant immunity to a prosecution witness in a court-martial, therefore, is an executive decision not subject to review by this Court. *See United States v. Villines,* 13 M.J. 46, 56 (C.M.A.1982) (Cook, J., concurring in the result); *see also United States v. Herman,* 589 F.2d 1191 (3d Cir.1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979); *United States v. Rocco,* 587 F.2d 144 (3d Cir.1978).

■ Moreover, a challenge to a grant of immunity, like an assertion of the privilege against self-incrimination, is personal, and appellant normally is without standing to contest the legal sufficiency of grants of immunity to government witnesses. *United States v. Hathaway,* 534 F.2d 386, 402 (1st Cir.1976), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Braasch,* 505 F.2d 139, 146 (7th Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *United States v. Le Pera,* 443 F.2d 810, 812 (9th Cir.1971); *United States v. Trammel,* 583 F.2d 1166, 1168 (10th Cir.1978), *aff'd,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). *Cf. United States v. Martin,* 9 M.J. 731 (N.C.M.R.1980), *aff'd,* 13 M.J. 66 (C.M.A.1982). As a rule, appellant has no standing to contest the propriety of the grants of immunity given to those prosecution witnesses who testify against him, *United States v. Lewis,* 456 F.2d 404, 410 (3d Cir. 1972), even where the grants are in violation of statutory law. *Cf. United States v. Rauhoff,* 525 F.2d 1170, 1178 (7th Cir. 1975).

■ An exception which admits both appellant's standing to contest grants of immunity and this Court's authority to review the legality of such grants exists if the alleged deficiencies of the grants create a likelihood that appellant was deprived of his constitutional or military due process rights to a fair trial by court-martial. *See United States v. Martin,* 9 M.J. 731, 747–48 (N.C.M.R.1979), *aff'd,* 13 M.J. 66 (C.M.A. 1982); *see also United States v. Maxfield,* 43 C.M.R. 336, 337 (C.M.A.1971); *cf. Unit-*

*ed States v. Lenz,* 616 F.2d 960, 963 (6th Cir.1980); *Earl v. United States,* 361 F.2d 531, 534 n. 1 (D.C.Cir.1966). Such is not the situation in this case. These immunized government witnesses were otherwise competent to testify, regardless of the technical validity of their grants of immunity. Mil.R.Evid. 601. Appellant does not assert that the grants of immunity were designed to either expressly or tacitly encourage any type of testimony other than the truth. In fact, the witnesses could, in accordance with the terms of the grants, subsequently be prosecuted if perjury were committed. Considering the totality of the circumstances, appellant cannot successfully claim a deprivation of any constitutional or military due process right to a fair court-martial proceeding merely because competent government witnesses testified against him, either voluntarily or pursuant to tendered grants of immunity. Accordingly, appellant is without standing to contest the validity of the grants of immunity to the government witnesses.

We have considered the issues personally raised by appellant and all other issues briefed by his counsel and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Chief Judge SUTER and Judge COHEN concur.